Barry CLIFFORD, Plaintiff, Appellant,

v.

M/V ISLANDER, et al.,
Defendants, Appellees.

Barry CLIFFORD, Plaintiff, Appellee,

v.

M/V ISLANDER, et al.,
Defendants, Appellants.

Nos. 83–1521, 83–1522.

United States Court of Appeals,
First Circuit.

Argued Oct. 1, 1984.

Decided Dec. 18, 1984.

Robert S. Wolfe, Boston, Mass., with whom Wolfe Associates, Boston, Mass., was on brief for Barry Clifford.

Frank H. Handy, Jr., Boston, Mass., with whom Kneeland, Kydd & Handy, Boston, Mass., was on brief for M/V Islander, et al.

Before COFFIN, Circuit Judge, TIMBERS,* Senior Circuit Judge, and BREYER, Circuit Judge.

COFFIN, Circuit Judge.

The question posed by this case is under what theory, and to what extent, plaintiff Barry Clifford should be compensated for his assistance in making temporary repairs to the M/V ISLANDER (the ISLANDER), a ferry owned and operated by defendant Steamship Authority (the SSA), after the bottom of her hull was holed while leaving Martha's Vineyard. The district court found that Clifford's efforts did not constitute an act of pure salvage and were not performed pursuant to a salvage contract. The court determined instead that Clifford had entered into an oral maritime contract with the SSA under which he was owed $150,000 for his services. On appeal, Clifford challenges the district court's conclusion that there was no act of pure salvage, seeks a higher damages award, and requests an award of prejudgment interest and attorney's fees. On cross-appeal the SSA challenges the award of $150,000 in damages, arguing that Clifford's services could not be worth more than a few thousand dollars. For the reasons discussed below, we affirm the district court's, 565 F.Supp. 922, judgment except with respect to the amount of damages.

* Of the Second Circuit, sitting by designation.

## BACKGROUND

The following summary of facts, many of which were stipulated to by the parties, is drawn from the findings made by the district court after the conclusion of an eight-day, non-jury trial.

The ISLANDER is a double-ended ferry, which means it has a propeller and a rudder at both ends. Under normal conditions, the ISLANDER's draft at the bow is 10'3" and at the stern 9'11". On the day it was holed, March 19, 1980, it was operating between Woods Hole at the southwestern end of Cape Cod and the nearby island of Martha's Vineyard. Although at the latter destination the ISLANDER usually docked at the Vineyard Haven terminal in the winter months, including March, that terminal was undergoing repairs on March 19, and the ISLANDER was therefore using the Oak Bluffs terminal, which was more exposed to winter storms from the open ocean to the east.

At 9:20 a.m. on March 19, the ISLANDER struck an underwater rock just minutes after leaving the Oak Bluffs terminal. Water flooded into its Number Two and Three compartments, toward the bow, and began leaking at a much slower rate into the engine room. Unsure of the extent of the damage, the captain turned the ISLANDER back toward the Oak Bluffs terminal and radioed the ticket agent for assistance.

At approximately 9:40 a.m., when the ISLANDER reached the terminal, its bow was already approximately two feet lower in the water than usual and its stern an equivalent amount higher in the water. Consequently, the rudder and propeller in the stern were exposed at least partially and the vessel had lost much of its ability to be steered from that end. It crashed into the outer end of the terminal's slip, fracturing more than twenty pilings.

Ultimately, the vessel was secured and a special ramp was constructed because it was lying lower in the water than usual. The 130 passengers, 45 cars, and five of

the six trucks that were onboard were then unloaded. At the time, the Captain believed that there was approximately a foot of water between the keel of the boat and the bottom of the slip.

Even before the ramp was built, fire trucks had arrived and begun to pump water from the flooded compartments. Although the fire trucks' pumps and those of the ship were unable to reduce the level of the water in the compartments, there was no increase in the water level and the ISLANDER was in no danger of sinking.

The captain decided not to move the vessel until temporary repairs were made. Although at least two private citizens appeared and volunteered to dive and try to locate and block all the holes, the first diver whom the SSA called for assistance was Mr. Wayne Iacono. When he arrived at approximately 11:00 a.m., he was asked to suit up by Mr. Harold Brackett, the SSA's maintenance and construction manager, and told that the SSA could use all the help that it could get. Not long thereafter, Mr. Stephen Broderick, an assistant SSA engineer, took command of the diving process when he noticed that the first individuals to dive were getting tired. Broderick instructed Iacono to go ahead and dive and to send the bill for his services to the SSA.

Shortly thereafter, plaintiff Clifford appeared on the scene. His wife had received a call from the SSA requesting Clifford's assistance. She had phoned him at work and conveyed the message that he was to go to the terminal with his equipment. He immediately returned home for his diving equipment and drove to the terminal. His gear was considered the most advanced available, and his reading and experience with respect to diving and salvaging were extensive. The evidence in the record indicates that he was in extraordinarily good physical condition, that he had been on a number of successful salvage and treasure hunting expeditions, and that he was probably the most skilled diver on Martha's Vineyard. As the district court summed up

the matter, "Clifford's experience as a diver and salvor was unique."

When he arrived, he first met Broderick and Chief Engineer Thomas Cunniff and volunteered his services. He was taken to Mr. Brackett, who was identified as being in charge of the operation. A conversation ensued, which was joined by Mr. Ronald Eastman, the Assistant General Manager of the SSA, and Mr. William Marks, a local official from Martha's Vineyard and acquaintance of Clifford. When Clifford asked about the ISLANDER, the SSA officials were able to give him a description of the vessel but not an exact description of the damage. Nor were the amateur divers able to tell him much more than the rough location of the holes and that efforts to block the holes with traffic cones had failed. Clifford indicated that he would survey the vessel's bottom and then recommend repairs.

He dove into the water at approximately noon and proceeded to assess the damage. The visibility in the water was poor because of the presence of silt, the water temperature was only thirty-five degrees Fahrenheit, the currents were moderately strong, and the keel of the vessel was not far from the bottom of the slip. These rather difficult and risky conditions were to prevail throughout the period of his services.

Also found by the district court, but not stipulated to by the parties, were the following additional facts. Steven Broderick hired Clifford as a diver to aid in the repair of the vessel, and Clifford was informed that he was being hired on a daily basis and that he should submit a bill to the Steamship Authority. Whether this agreement was struck before or after Clifford performed his initial survey is not stated by the district court, but the evidence suggests that it was struck beforehand.

The district court also found that Clifford drew up the four-phase plan of repair that was eventually successfully executed. In the first phase divers were to place a tarpaulin under the holed section of the boat, which would be tied and kept in place

by four ropes and by the force of the water outside as the water inside was pumped out. The second phase required the placement of small wooden patches on the outside of the tarp-covered holes. This would take multiple dives, always with one diver outside and one inside to secure each patch with a rope that was punched through the patch and the tarp. During the third phase plywood patches would be applied over the holes on the inside of the vessel and secured by ramming four by four wooden beams between the patches and the compartment walls. In the final phase, steel plates were to be welded to the inside of the vessel. Each of the first three phases presented significant risk of injury to the divers.

The district court further found that after Clifford presented this plan to SSA officials, it was adopted. Clifford and others under the direction of Eastman, Brackett, and Broderick then implemented the plan. While there is no question that SSA personnel, as well as other professional divers who appeared on the evening of March 19, played a major part in carrying out the plan, it is also clear that Clifford was a, if not the, key actor during the first three phases of the operation. He took on tasks that others were unable or unwilling to undertake and performed them successfully. He apparently suffered an injury to his ear and considerable fatigue and dizziness as the operation proceeded through the afternoon and evening of March 19 and the morning of March 20.

Throughout these two days the weather was good and presented no problems. The repairs were completed on March 20, and the vessel departed at 12:50 a.m. on March 21. It went first to Woods Hole and then to Boston for permanent repairs. It reached Woods Hole, which lies approximately five miles away, in less than an hour and Boston by 10:15 a.m. The trip was uneventful and the temporary repairs thus completely successful.

The ISLANDER was valued at $2,500,-000 at the time that it left for Woods Hole.

The permanent repairs made at Boston cost $450,000.

On the basis of these facts the district court concluded first that Clifford had not undertaken an act of pure salvage. In particular, the court noted that the essential element of "marine peril" had not been proven, there being neither actual peril nor any apprehension of peril during the period of Clifford's services. The court found that the water level had stabilized, the engine room was not flooded, the ship could return to Woods Hole under its own power without repairs, if necessary, and the weather was good from the time of the accident until sometime after the ISLANDER reached Boston.

The district court further concluded that Clifford had also failed to prove a salvage contract in that there was no evidence of an agreement to pay a specific sum of money, which the court found to be an essential element of such a contract. The court went on to determine, however, that an oral maritime contract had been entered into by the parties and that under its rather general terms an award of $150,000 would constitute appropriate compensation for Clifford's services.

As noted earlier, Clifford challenges as clearly erroneous the district court's finding that there was no maritime peril and thus no act of salvage, and he also seeks an award for prejudgment interest and attorney fees. The SSA, by contrast, attacks the amount of the award, arguing that the oral maritime contract found by the district court calls for nothing more than fair compensation on a daily basis and that thirty-some hours of even the most heroic and successful diving efforts cannot possibly merit an award of $150,000. We shall consider each of these aspects of the cross-appeals in turn.

DISCUSSION

In reviewing the district court's findings, we may not set aside the judgment below unless we find it to be clearly erroneous. "No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the

Federal Rules of Civil Procedure.... A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954) (citations omitted). Under this standard, the district court's finding of no act of salvage must be upheld but its damages award vacated.

### 1. *No Act of Salvage*

■ The elements of proof of a valid claim for pure salvage are not in dispute. The three elements that must be present are: "1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or ... service [contributing] to such success." *The Sabine*, 101 U.S. (11 Otto) 384, 25 L.Ed. 982 (1879); *see also* M. Norris, *The Law of Salvage* § 15, at 24 (1958).

■ Considering these elements in reverse order, we find initially that there is no question that the service that Clifford rendered was a total success and contributed directly to enabling the ISLANDER to continue almost as if she had never been holed. We are not so sure, however, that the element of voluntariness was proven. Although the district court did not address this question directly, its express determination that a salvage contract had not been proven[1] could be interpreted as implying that Clifford's assistance was "voluntary" within the meaning of the law of salvage. Although we do not decide the question, we have grave doubts that such a view of Clifford's services is justified. Certainly, Clifford was not under a duty such as that which the Coast Guard personnel and crew members of the ISLANDER had by virtue of their regular employment. But it seems probable that the oral maritime contract that the district court found would be considered a "special contract", creating a duty to assist and rendering Clifford's services "non-voluntary". *Id.*

■ Whether or not this is so need not be determined, though, for we conclude as to the remaining element that the district court was not clearly erroneous in finding an absence of marine peril. Marine peril occurs when a vessel is exposed to any actual or apprehended danger which might result in her destruction. "All services rendered at sea to a vessel in distress are salvage services. It is not necessary, I conceive, that the distress should be immediate and absolute; it will be sufficient if, at the time the assistance is rendered, the vessel has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered." M. Norris, *The Law of Salvage* § 63, at 97 (quoting *The Charlotte*, 3 W. Rob. 68, 71 (High Court of Admiralty

1. While we agree with the determination that no salvage contract was proven, we disagree with the district court's analysis of this issue. First, the district court implied that the burden of proof lay with Clifford; yet, this was not so. He never claimed that a salvage contract existed, only that he had undertaken an act of pure salvage. It is clear that the burden of proving a salvage contract to disprove the element of voluntariness lies with the respondent to a claim of pure salvage, M. Norris, *The Law of Salvage* §§ 161 & 162, in this case the SSA. Second, the district court based its finding of no salvage contract on what appears to be an overly restrictive interpretation of how specific the terms of payment must be. The district court held that the contract must specify the exact amount the salvor is to be paid; yet, the quotation set forth to support that holding expressly undermines it. As the quoted language from *The Camanche*, 75 U.S. (8 Wall.) 448, 477, 19 L.Ed. 397 (1869), indicates, "a binding engagement to pay at all events", which is certainly what we have here, is sufficient.

Rather than rely on this arguably flawed rationale, we note simply that the services to be rendered under a salvage contract must be "in the nature of salvage", M. Norris, *The Law of Salvage* § 160, at 263. Under the district court's other findings, which we uphold in the discussion that follows, the services that Clifford was to perform were not in the nature of salvage services simply because there was no apprehension of the ship's being in peril at the time that he entered into the contract. Under this view of what transpired, he was hired not to salve the ISLANDER, i.e., not to save it from destruction, but rather to assist with the making of temporary repairs while it lay secure at the terminal.

(1848)). Reasonable apprehension of peril, whether actual or not, is enough. "[I]t is sufficient that at the time the assistance is rendered the ship has encountered any danger or misfortune which might possibly expose her to destruction if the service were not rendered.... A situation of actual apprehension, though not of actual danger, is sufficient." *The Plymouth Rock*, 9 Fed. 413, 416 (S.D.N.Y.1881) (citations omitted); *see generally* M. Norris, *The Law of Salvage* § 65.

With regard to this case, we note initially that while the district court's ultimate finding of no peril is not clearly erroneous, we consider the question of peril to be somewhat closer than the district court's opinion would suggest. This is true for a number of reasons. The first is that the record clearly shows that on March 21 and 22, there was a major storm with winds gusting up to 40 and 50 miles per hour, which caused considerable damage to craft moored even in the sheltered areas of Oak Bluffs. Furthermore, it appears probable that the SSA and the Coast Guard, which was present throughout the period in question, learned of forecasts of this storm sometime during the 20th. Also not mentioned by the district court is the fact that at some point on the 19th of March the Coast Guard "pulled" the ISLANDER's inspection certificate, and that the senior Coast Guard official at the scene testified that he did not think that it would be prudent to allow the vessel to return to Woods Hole before temporary repairs were completed. Finally, the district court's statement that the evidence "indubitably evinces the capacity of the ship to be moved under its own power without temporary repairs" dismisses too lightly not only the testimony of that Coast Guard official but also the testimony of SSA officials to the effect that a return voyage made without repairs could take one to two hours, or three times longer than usual, and might have to be executed by proceeding "backwards" and using the raised stern propeller to pull the vessel but the lowered bow rudder to steer it.

■ Despite the district court's failure expressly to come to grips with this evidence, however, we do not think its ultimate finding of no peril is clearly erroneous. Of course, immediately after the submerged rock was struck and until some minutes after the ISLANDER was secured at the terminal a situation of actual peril existed. The vessel's coming about, the captain's inability to determine immediately where the boat had been holed, the radio call for assistance, the partial loss of steering at the stern, and the consequent ramming of the pilings all support a finding of actual peril. However, the record also indicates that this critical period ended no later than an hour later, sometime before 11:00 a.m., when all the passengers and all the vehicles, but one, had been removed. At that point, it became clear that the ISLANDER was not sinking. Although it is true that the pumps could not reduce the level of the water in the two flooded compartments, Clifford was unable to show that turning the pumps off would result in the water level rising. The implicit conclusion of the district court that the pumps were doing no more than drawing out water which, in turn, reduced the water pressure inside so that an equal amount of water was drawn through the holes from the outside is amply supported by the testimony of a number of witnesses. Also, it is clear that the winds were light to moderate and the skies mostly clear for the ensuing forty-eight hour period. The vessel was well secured, and its crew and other SSA officials were on board, in command, and dealing with the problem of determining the amount of damage done and deciding whether or not to undertake temporary repairs. Thus, there was no *actual* peril when Clifford arrived at approximately 11:30 a.m.

As for the question of *apprehension* of peril, while it is easy to imagine that the SSA might have suffered from such an apprehension, the district court was not clearly erroneous in its conclusion that Clifford failed to carry his burden of proving

this element.[2] Looking specifically to the facts that we have just noted above, we find a number of gaps in Clifford's case. First, he failed to prove exactly when the Coast Guard and SSA officials became concerned about the approaching storm. Even if we were somehow to assume that they learned by midday on the 20th that a storm was forecasted for the late afternoon of the 21st, we would still be left with the fact that by that time on the 20th the first three phases and most, if not all, of phase four of the plan had already been implemented successfully. The Coast Guard officer testified that he did not feel that the weather conditions contributed a sense of urgency to the repair process, and Clifford failed to show that there was any anticipation of bad weather during the critical initial period when he volunteered his services, conducted the survey of the bottom of the boat, and recommended a plan. Furthermore, although the Coast Guard pulled the ISLANDER's certificate, there was testimony suggesting that the Coast Guard does this even when minor problems exist on a ferry and that the captain could have legally operated the vessel as long as he did not carry any passengers or cargo. In addition, Clifford did not show what the Coast Guard would have advised if it had felt that a storm was coming up sooner and that there was not enough time to make temporary repairs and return to Woods Hole before the storm arrived.

Finally, and most importantly, as the district court stated, there was ample testimony from SSA officials themselves that they were not apprehensive during the period that Clifford was engaged. They stated that they needed a survey of the bottom merely to determine the best course of action, not to allay any fears that there was a risk that the boat would sink or be damaged further by a storm. They stated that they believed that the vessel could return to Woods Hole without repairs but chose to take a more cautious course of action. Although Clifford's testimony on this point differed from that of the SSA officials, their testimony was found to be more credible and was enough to support the district court's conclusion.

Whether we would have come to the same conclusion is not important. The issue of apprehension is factual in nature and its determination turns to a great extent on which of the witnesses is to be believed. In this case, although one gets the clear sense that not all of the testimony given by the SSA officials was accurate and true, one is left with perhaps an even stronger sense that Clifford's tale was a bit tall. The fact that even his acquaintance, William Marks, remembered certain events differently than did Clifford was enough by itself to justify the district court's giving greater credence to the SSA's version of what the perceived risks were. This being the case, we cannot say that the district court was clearly erroneous in its finding of no peril.

2. *Damages*

Turning to the finding of an oral maritime contract and the question of damages, we note initially that the parties appear to agree that if we conclude there was no act of pure salvage, as we do, then we must uphold the finding of an oral maritime contract. The issue that remains therefore is whether that contract called for $150,000 in damages.

The district court found that Clifford was hired to aid in the repair of the vessel, that he was being hired on a daily basis, and that he later should submit a bill to the Steamship Authority. While noting that there was considerable conflict in the testimony concerning this contract, we find ample support for the district court's description of its terms. It is clear that these did not include an agreement as to what a reasonable daily rate would be. The court therefore had to turn to extrinsic evidence to determine this rate. However, the only

---

**2.** "The burden of proof that the vessel ... is in peril is upon the one claiming a salvage award."

M. Norris, *The Law of Salvage* § 64, at 99.

extrinsic evidence the district court had was Clifford's own testimony that his "act of pure salvage" entitled him to an award of approximately $1,000,000, the statement in his complaint that his secondary claim in quantum meruit was for $250,000, and evidence that he was paid $600 per day for an underwater survey of the Oak Bluffs terminal, which he performed a few days after the ISLANDER left for Boston.

Somehow, without referring to any of this extrinsic evidence or making any other findings of fact, the district court determined that the "terms and conditions" of the contract called for an award of $150,-000 in damages. The explanation for this result is simply lacking. With the scant information that we have, it seems impossible to conclude that Clifford's daily rate was as high as $50,000 or $75,000. It may be that the district court implicitly determined that the contract was not simply for diving but also for conducting a survey, formulating a plan of repair, and immediately overseeing the implementation of that plan, and that such a contract would require a greater daily rate than that for diving. It may also be that the district court saw in the circumstances under which Clifford was hired, an expectation on the part of the SSA that it would have to pay much more if it ultimately asked him to remain on the scene for a long, tiring, trying period of time, which he appears to have done. So too, it may be that the district court factored in the risks which Clifford faced and which must have been obvious at the outset to Broderick and the other SSA officials.

 All of these factors and a number of others may have been taken into account by the district court, but we are in no position to know that at this time. This being so, we have no choice but to remand for further findings concerning what damages should be awarded under the contract. Cf. *United States v. 20.53 Acres of Land, Etc.*, 478 F.2d 484, 486–87 (10th Cir.1973) (case remanded for further findings as to how certain property interests had been valued).

We sympathize with the sense of justice that apparently led the district court to its damages figure: the recognition that although this operation could not quite qualify for the more liberal treatment given pure salvage, it deserved compensation far above that to be expected for a routine contract for services. Nevertheless, there must be in the record sufficient basis for a reasoned judgment for damages. In this case the court should feel free to reopen the record to receive evidence of the worth of the exceptional services that were rendered under such trying circumstances. Should this be allowed, SSA of course should be accorded similar opportunity to submit contrary evidence.[3] At the conclusion of such reconsideration, we shall expect specific findings supporting the final award.

All that remains then are Clifford's argument that he should have been awarded prejudgment interest and attorney's fees and the SSA's contention that any damages award should be reduced because Clifford made an excessive, if not false, claim for salvage and threatened to seize the M/V ISLANDER if a bond were not posted. It would not be appropriate for this court to review these matters at this time. We find nothing in the district court's opinion to

---

3. While reopening a record should be permitted only in an unusual case, this is such a case. The disparate contentions of the parties and the position finally taken by the district court all seem to occupy non-overlapping areas. Clifford concentrated on his salvage claim which he assumed would, if successful, entitle him to a very significant percentage (40%) of the vessel's value. No consideration seems to have been given to recognizing, if the case were deemed one of salvage, a much smaller percentage. The SSA, on the other hand, contemplated at most a modest diving fee for a few hours. And the court, rejecting both the claim for two fifths the value of the vessel and a ceiling of a few thousand dollars for a few hours of skilled service, adopted its middle course. Now that the issue of compensation under an oral maritime contract is for the first time recognized by all as the dispositive issue, it seems fairest to the parties and the court to give opportunity to meet this issue if the existing record is deemed inadequate.

suggest that it has even considered them. Whether or not it has done so, they will need to be reconsidered in the light of this opinion and of whatever further findings are made with respect to the basic damages.[4]

*Accordingly, the district court's judgment is affirmed except with respect to its award of $150,000 in damages. That award is vacated and the case is remanded for further findings. No costs.*

---

4. Assuming the district court has the discretion to make such awards, the amount of any prejudgment interest or attorney's fees award that might be made will be determined at least in part by the final basic damages figure. Similarly, if the district court were to find bad faith on the part of Clifford, it might be that any basic daily rate of compensation that is calculated should be reduced. Without the benefit of any district court findings of fact or legal discussion concerning these matters, it would be idle for us to comment further about them.