688 F.Supp. 502 (1988)
AMERICAN HOME ASSURANCE CO., Plaintiff,
v.
L & L MARINE SERVICE, INC., Defendant/Third-Party Plaintiff,
v.
APEX R.E. & T., INC., et al., Third-Party Defendants.
No. 85-1820A(6).
United States District Court, E.D. Missouri.
June 15, 1988.
*503 Samuel Murphy, Lucas & Murphy, St. Louis, Mo., for plaintiffs.
James W. Herron, Lewis & Rice, St. Louis, Mo., for defendant L & L Marine Service.
John S. Sandberg, Timothy J. Phillips, St. Louis, Mo., for defendant APEX.

*504 MEMORANDUM OPINION
GUNN, District Judge.
This case involves an admiralty and maritime claim within the meaning of Rule 9(h), Fed.R.Civ.P. The Court has jurisdiction pursuant to 28 U.S.C. § 1333.
The cause arises out of the grounding of the loaded fuel tank barge APEX CHICAGO operated under charter agreement by third-party defendant Apex R.E. & T., Inc. ("Apex"), a wholly owned subsidiary of Apex Oil, Inc. At the time of the grounding, the barge was being towed by the towboat MAYA which was under charter to Apex but being operated by a crew of defendant L & L Marine, Inc. ("L & L").
Plaintiff American Home Assurance Co. ("American"), as insurer, paid Apex Oil Co. for the damage to the barge, the cost of the lost cargo and costs of pollution containment and cleanup. Plaintiff as subrogee seeks to recover from defendant L & L for its negligent operation of the tow MAYA. L & L has brought a third-party complaint against Apex under Rule 14(c), Fed.R.Civ.P., seeking indemnity or contribution alleging that the MAYA and its tow line were unseaworthy.[1]
Pursuant to Rule 52, Fed.R.Civ.P., the Court makes the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff American Home Assurance Co. is a New York corporation. Defendant L & L Marine Service, Inc. is a Missouri corporation. Apex R.E. & T., Inc. is a corporation existing according to law and is a wholly owned subsidiary of Apex Oil Company.
2. A Missouri partnership doing business under the name of Central Barge & Boat Company ("Central") was the owner of the tug MAYA and barge APEX CHICAGO. Central chartered both the tug and barge to Apex.
3. The incident giving rise to this action occurred on October 19, 1981. Prior to and during October 1981, L & L and Apex jointly participated in the operation of the tug and barge under agreement on the following basis: L & L employed, paid and provided the crew for the MAYA, paid for provisions and supplies and expended funds on behalf of Apex for maintenance and repair of the vessels. Apex reimbursed L & L, or paid directly, all fuel costs, maintenance and repair costs, and paid a daily amount to cover crew wages and costs. Apex dispatched the vessels and was in daily contact with the crew of the MAYA.
4. The parties operated the vessels as a unit, with the barge being pushed or towed by the tug. The barge had no crew. The tug and barge were designed to function as a unit. The barge had a notch in its stern to accommodate the bow of the tug for movement in a pushing mode. The tug was equipped with a towing hawser for placing the barge in tow behind the tug.
5. The vessels were engaged in moving petroleum cargoes for Apex Oil, in the APEX CHICAGO, between ports on the northeast coast of the United States. Apex contracted with Apex Oil for the movement of the cargoes and was paid by Apex Oil for those movements. Other than any profits included in the daily rate paid it, L & L did not share in any profits or losses realized by Apex from the movement of the cargos.
6. Under agreement, L & L's crew had the responsibility for navigating the tug and barge, and on October 19, 1981 was in charge of the navigation of tug and tow.
7. In the early morning hours of October 19, 1981, while enroute from Carteret, New Jersey, to Boston, Massachusetts, the tow line securing the barge to the tug parted in heavy seas causing the barge, carrying a cargo of unleaded gasoline, to become stranded on rocks known as "The Hen and Chickens" off the coast of Massachusetts *505 resulting in a loss of cargo aboard the barge. Apex Oil Co. was the owner of that cargo. L & L's crew was navigating the MAYA, with the APEX CHICAGO in tow at the time.
8. The barge was being towed on a hawser made up of a towing cable, a nylon shock line and a towing bridle. The bridle was made of chain and was secured to the port and starboard bow of the barge. A ten-inch circumference nylon shock line ran between the bridle and the end of the towing cable. The towing cable was mounted on a winch on the stern of the MAYA. The cable portion of the hawser parted. That cable was a one-and-one-half inch diameter galvanized wire made up of six parts of 24 metal strands each (6 × 24) with a rope core. The Apex purchase order shows that the cable, when installed, was 1,500 feet long and had a breaking strength of 133,000 pounds.
9. The anticipated route from Carteret, New Jersey, to Boston, Massachusetts, was through Long Island Sound, Block Island Sound, Rhode Island Sound, and then into Buzzard's Bay from which the tug and barge would enter Cape Cod Canal to Cape Cod and then to Boston Harbor.
10. The MAYA's captain was James Harrell; its relief captain was Wayne Katez.
11. During Wayne Katez's shift at watch from 12:00 a.m. to 6:00 a.m. on October 18, 1981 the MAYA proceeded in the pushing mode through Long Island Sound, traveling in a northeasterly direction. At 5:00 a.m. on October 18, 1981 the National Oceanic and Atmospheric Administration ("NOAA") issued a small craft advisory. NOAA's 5:39 a.m. weather forecast was:
Southerly winds increasing today to 20 to 30 knots and gusty by evening ... shifting to the west 15 to 20 knots late tonight and northwest Monday, visibility lowering to near a mile in occasional rain this afternoon and tonight. Seas building to 3 to 6 feet today ... 4 to 8 tonight.
12. At 6:00 a.m. Captain Harrell took over the watch and continued on course. At 8:15 a.m. Captain Harrell switched modes of handling the barge from pushing to towing, putting the barge on the tow wire. The tow wire was let out to a length between 650 and 750 feet and remained at this length for the remainder of the journey until the barge grounded.
13. During severe weather, it would have been advantageous to let out additional cable, but this could not be accomplished for the reason that the towing winch was mounted on the deck and required a manual release which would expose crew members to serious danger to attempt to shorten or lengthen the line under prevailing sea conditions.
14. The crew was not aware of the breaking strength of the tow line which had been installed prior to the time L & L began operation of the MAYA, and there were no documents on the tug which disclosed its breaking strength.
15. At 12:00 noon, Wayne Katez took watch as the MAYA continued pulling the APEX CHICAGO. At 2:00 p.m. the tug and barge were abeam Little Gull Island, which marks the end of Long Island Sound and the beginning of Block Island Sound.
16. Block Island Sound and Rhode Island Sound constitute waters unprotected from the Atlantic Ocean in the route from Carteret, New Jersey, to Boston, Massachusetts. It would be expected that higher seas and more adverse weather conditions would be encountered in the unprotected waters of Block Island Sound and Rhode Island Sound. Despite the small craft advisory and threat of worsening weather, Captain Harrell left the protection of Long Island Sound.
17. At 5:00 p.m. on October 18, 1981 NOAA changed the small craft advisory to gale warnings. NOAA's forecast was "southerly winds increasing 20 to 35 knots and gusty tonight shifting to westerly 20 to 35 knots and gusty Monday."
18. At 6:00 p.m. on October 18, 1981, when Captain Harrell came on duty, Mr. Katez informed him of the heavy seas and the gale warnings that had been issued. At this time the MAYA and APEX CHICAGO were two hours away from Block Island.
*506 19. Captain Harrell discussed the feasibility of getting in the lee of Block Island where several other vessels were riding out the storm in the sheltered waters. Captain Harrell did not stay in the lee of Block Island but proceeded northwest through Block Island Sound and Rhode Island Sound to Buzzard's Bay.
20. The charts aboard the MAYA did not include navigation charts of the area.
21. Captain Harrell was advised by the captains of the vessels in the lee of Block Island that the seas were getting very bad to the north of Block Island in Block Island Sound, but he nevertheless chose to continue the voyage toward Buzzard's Bay.
22. After the tug and barge left Block Island, the weather conditions worsened with winds reaching 30 to 35 knots out of the southeast and seas rising from 8 to 10 feet. Periodically a squall would increase the rain and wind making visibility close to zero. The squalls were so intense that it rendered the radar inoperative at times. During the periods when the tug was in a squall the barge could neither be seen visually nor on radar.
23. At 11:39 p.m. on October 18, 1981, the following weather forecast was broadcast by NOAA:
Gale warnings still in effect. Wind southerly 20 to 35 knots rest of tonight shifting to the west 20 to 35 knots Monday morning and to the northwest 25 to 35 knots Monday afternoon diminishing Monday night. Visibility below a mile in rain and fog overnight ... Seas 3 to 6 feet except up to 8 feet at (Buzzard's) Bay entrance....
24. At 12:00 midnight Mr. Katez took over the duty watch. A gale warning continued with heavy seas, rain and winds from 30 to 35 knots. The radar showed the tug and tow three and a half miles outside of Buzzard's Bay at 12:00 midnight. Captain Harrell stayed on the bridge until 12:20 a.m. discussing with Katez their options and the weather conditions. Before leaving the bridge Captain Harrell gave Katez instructions to slow down to three knots once the tug and barge entered the bay in order that they would arrive at Cape Cod Canal by daylight as they did not have charts of that area.
25. At 12:45 a.m., after several strong jerks, the tug began to rock violently and pick up speed. The tow line parted at this point and the barge became adrift. However, Katez did not discover the barge was adrift until 1:15 a.m. when he saw the tow wire going straight down. He then notified Captain Harrell.
26. The towing cable pulled apart under repeated stress because it was not of sufficient strength to withstand the weather conditions.
27. At 1:30 a.m. on October 19, 1981 the crew had pulled in the tow line and the MAYA had turned 180 degrees on a reciprocal course from the direction it came. At 2:30 a.m. the crew made a visual sighting of the barge grounded on Hens and Chickens shoal, approximately one mile off the coast of Massachusetts and attempted to come along its side. The captain and the crew of the MAYA could see that the barge had been damaged and that gasoline was escaping through a gash.
28. The APEX CHICAGO had two emergency tow wires on board, but they were coiled contrary to good seamanship.
29. At 2:45 a.m. the crew started rigging an emergency tow wire to pull the barge away from the rocks. In the crew's attempt to attach the wire, the barge was further damaged when the tug was backed into its bow.
30. At 3:45 a.m. the emergency tow wire was in place and the tug began to pull the barge off the rocks. The MAYA was able to tow the barge about 1/10 of a mile when the starboard engine quit due to a clogged fuel filter. Captain Harrell was unable to control the tug with one engine, causing it to go into shallow water where it ran aground. The Coast Guard was thereupon called. The MAYA was towed from its stranded circumstance by the tugs JAGUAR and CHICOPEE.
31. A portion of the cargo aboard the APEX CHICAGO was lost in the casualty. American paid Apex Oil $99,081.84 on November 24, 1982, and an additional *507 $6,032.00 on April 15, 1983, under its cargo policy for the fair market value of the lost cargo ($85,852.74) and pollution containment and cleanup ($19,261.10) which the parties agree were fair and reasonable charges, totalling $105,113.84.
32. A general average was declared by Central and Apex Oil and, pursuant to that declaration, a general average adjustment was prepared by Johnson & Higgins, the marine insurance brokers for Apex Oil and its related entities, as well as an adjustment and apportionment of other items, expenses and charges among the hull and cargo underwriters. L & L did not participate in the adjustment or apportionment of any of the claims and expenditures arising from the casualty, including the general average adjustment.
33. A salvage claim was asserted against the tug, the barge, Central and Apex Oil by the owners of the tug JAGUAR. L & L was not a party to the proceeding which was arbitrated by the American Institute of Marine Underwriters ("AIMU"). American and the hull insurers on the vessels did not challenge the decision of the A.I.M.U. in court and, pursuant to the general average declared, American paid $47,190.73 to the attorneys for the JAGUAR's owners. New York City law firms charged fees totalling $30,339.49[2] to defend various interests in the salvage arbitration proceeding. These fees were paid by American.
34. The owner of the CHICOPEE, the other tug pulling the MAYA and APEX CHICAGO, submitted a towing bill for $6,114.80 but made no claim for salvage. This bill was apportioned in the general average portion but has not been paid. The bill is a reasonable charge for towing.
35. Also pursuant to the general average adjustment, the marine insurance brokers/adjusters (Johnson & Higgins) apportioned the following items for payment by the cargo underwriter, American:
(a) $48,011.65, primarily representing a portion of the cost of repairing hull damage sustained by the APEX CHICAGO in the casualty;
(b) $32,235.93, representing miscellaneous items, primarily made up of a portion of a Hill, Rivkins' bill for legal services rendered after it declared it had a conflict of interest and had ceased to represent the cargo interest, the charges of Johnson & Higgins for performance of the adjustment of the claim, and the CHICOPEE's towing charge.
American paid item (a) by a check in the amount of $89,583.77 to Johnson & Higgins on September 3, 1985. It has declined and refused to pay any of the amounts in item (b). The check for $89,583.77 also paid items totalling $41,572.12, apportioned by Johnson & Higgins, which were primarily for charges made by Apex for completion of the voyage by the barge PRINCESS B, into which the cargo was placed.
The parties agree that item (a) charges are part of the bill for repairs performed to the hull of the APEX CHICAGO and that the charges made for repairs were fair and reasonable.

Conclusions of Law
1. The Court finds that the October 19, 1981 grounding of the barge APEX CHICAGO and resultant damage and loss was caused equally by the negligent navigation of the MAYA by L & L's crew and the unseaworthy condition of the MAYA by reason of its defective towing cable and winch.
2. The parties have stipulated that liability for damage arising from negligence of the crew in operating the MAYA is attributable to L & L. The crew of L & L was under a duty to exercise the reasonable care and maritime skill that prudent navigators employ in performing their services. Stevens v. The White City, 285 U.S. 195, 202, 52 S.Ct. 347, 349, 76 L.Ed. 699 (1932); Mid-America Transportation Co. v. National Marine Service, Inc., 497 F.2d 776, 779 (8th Cir.1974), cert. denied, 425 *508 U.S. 937, 96 S.Ct. 1671, 48 L.Ed.2d 179 (1976).
3. The crew of the MAYA failed to fulfill the requisite skill required of prudent navigators in the following respects and which directly contributed to the grounding of the APEX CHICAGO.
Despite being advised of gale warnings and extremely adverse weather conditions, Captain Harrell of the MAYA continued through the unprotected waters of Block Island Sound and Rhode Island Sound, which were exposed to heavy seas. Prudent navigation practices required him:
(1) to turn around to the safety of Long Island Sound; or
(2) to remain in the lee of Block Island and maintain his position using low power; or
(3) to seek other protected waters at Gardiners Bay, in the lee of Plum Island, and in the lee of Montauk Point; and
(4) to have adequate navigation charts aboard the MAYA.
4. By virtue of having paid certain amounts to or on behalf of its insureds, American is subrogated to the rights of the parties insured under its policy of cargo insurance and stands in the stead of its insureds. However, the amounts vest no greater rights in it than the insured parties would have if they had filed the suit on their own behalf. Complaint of Admiral Towing & Barge Co., 767 F.2d 243, 250 (5th Cir.1985). As subrogee, American holds the same position as Apex and is subject to the same defenses which could be imposed against Apex. Omaha Indemnity Co. v. Johnson & Towers, Inc., 599 F.Supp. 215, 218 (E.D.N.Y.1980).
5. L & L has filed a third-party complaint against Apex alleging that the MAYA was unseaworthy. The parties stipulated that Apex warranted the vessels and all of their equipment, which included among other items the towing winch and towing cable, were seaworthy in all respects and that liability for damages arising from any unseaworthiness of either vessel, the towing cable, winch or any other equipment is ultimately attributable to Apex.
6. The warranty of seaworthiness is a species of liability without fault and imposes a duty which is an absolute, continuing and nondelegable incident of vessel ownership. Baker v. Raymond Int'l, Inc., 656 F.2d 173, 181 (5th Cir.1981), cert. denied, 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed. 2d 861 (1982) (citation omitted).
7. The weather conditions present at the time of the casualty were not so unusual as to be unforeseeable, and Apex was required to equip the tug with a cable capable of withstanding forces present in such conditions. Walker v. Harris, 335 F.2d 185 (5th Cir.1964).
8. The MAYA was not reasonably fit for service and thereby unseaworthy because the towing cable was understrength. The absence of a friction brake on the towing winch, the mounting of the winch in an exposed position on the stern of the vessel and the need to manually release the dog catch on the drum of the winch, a maneuver which posed an unreasonable danger to the crew, also contributed to the unseaworthiness of the MAYA and affected adversely the ability of the undersized towing cable to withstand foreseeable weather. Lee v. Pacific Far East Lines, 566 F.2d 65, 67 (9th Cir.1977); Missouri Portland Cement v. Walker Barge Fleeting Services, 561 F.Supp. 12, 14 (W.D.Ky. 1982).
9. A contributing cause of the casualty was the inadequacy of the towing cable, which was a breach of the warranty of seaworthiness given by Apex to L & L.
10. Where unseaworthiness of a vessel and negligence combine to cause a casualty, the Court must apportion the damages between the causes. United States v. Reliable Transfer Co., 421 U.S. 397, 408, 95 S.Ct. 1708, 1714, 44 L.Ed.2d 251 (1975); Consolidated Grain & Barge Co. v. Archway Fleeting & Harbor Services, 712 F.2d 1287, 1289 (8th Cir.1983).
11. The last clear chance doctrine is not available in maritime cases and the damages must be apportioned among *509 wrongdoers proportionate to the comparative degree of their fault. Prudential Lines v. McAllister Bros., 801 F.2d 616, 620-21 (2d Cir.1986); Hercules, Inc. v. Stevens Shipping Co., 765 F.2d 1069, 1075 (11th Cir.1985).
12. The parting of the towing cable allowed the barge to drift onto the rocks, and the cable was below its required strength. The Court concludes that the fault of the casualty lies equally upon L & L for its crew's imprudent navigation under existing weather conditions and upon Apex for its supplying an unseaworthy vessel due to faulty equipment, specifically the tow line and winch.
13. Two tugs, the JAGUAR and the CHICOPEE, assisted the Coast Guard in pulling the MAYA and APEX CHICAGO from the "Hen and Chickens" rocks. The CHICOPEE was the larger of the two vessels and submitted a towing bill for $6,114.80. The parties stipulated that that charge for towing was fair and reasonable.
14. The owners of the JAGUAR contend that their services should be compensated as "salvage" rather than towage and the dispute was arbitrated, resulting in an award of $130,000 in salvage to the owners of the JAGUAR. L & L was not a party to that proceeding and was not represented. It is not bound by the results of the arbitration. Ufheil Construction Co. v. Town of New Windsor, 478 F.Supp. 766 (S.D.N.Y.1979), aff'd, 636 F.2d 1204 (2d Cir. 1980).
15. The party claiming salvage bears the burden of proving that the services were performed at a time when the MAYA and the APEX CHICAGO were in an imminent marine peril which could destroy them. Clifford v. M/V Islander, 751 F.2d 1, 5 (1st Cir.1984); Neptune Maritime Co. v. Vessel Essi Camilla, 562 F.Supp. 14, 24 (E.D.Va.1982), aff'd, 714 F.2d 132 (4th Cir.1983). The Court concludes that the services of the JAGUAR were towage, rather than salvage. See Clifford v. M/V Islander, supra. Plaintiff has not proved that services rendered by the JAGUAR were salvage. See Clifford v. M/V Islander, supra. Therefore, the fair and reasonable charge for services performed cannot exceed the amount paid the owners of the CHICOPEE, or $6,114.80.
16. The interests involved in a general average are vessel and cargo. Orient Mid-East Lines v. A Shipment of Rice, 496 F.2d 1032, 1038 (5th Cir.1974); CIA. Atlantica Pacifica, S.A. v. Humble Oil & Refining Co., 274 F.Supp. 884, 891 (D.Md. 1967).
17. General average does not lie where one of the interests in the venture created the peril through (1) acts of negligence, or (2) an unseaworthy condition of the vessel. Negligence of the crew is attributed to the vessel and if crew negligence creates the peril, then general average is inappropriate. The Irrawaddy, 171 U.S. 187, 189, 18 S.Ct. 831, 832, 43 L.Ed. 130 (1898). Similarly, unseaworthiness of the vessel defeats general average. Orient Mid-East Lines v. A Shipment of Rice, 496 F.2d at 1038; Gilmore & Black at § 5-13.
18. It is clear that the barge and tug constitute the "vessel" in general average. The James P. Donaldson, 167 U.S. 599, 17 S.Ct. 951, 42 L.Ed. 292 (1897); S.C. Loveland Co. v. United States, 207 F.Supp. 450, 453 (E.D.Pa.1962). Further, the parties stipulated that Apex and L & L jointly operated the vessels as a unit. Thus, plaintiff is confronted with an insuperable legal barrier to its attempt to collect general average payments as crew negligence or unseaworthiness of the vessel and its equipment are necessary predicates to liability, but the presence of either makes the general average payments inappropriate and brands them "voluntary" payments that are not recoverable by the subrogated insurer. Complaint of Admiral Towing & Barge Co., 767 F.2d 243, 250 (5th Cir.1985).
19. American belatedly and correctly called a halt to general average contributions and refused to contribute for legal fees incurred to Hill, Rivkins after it employed separate counsel in the salvage proceeding. It also declined to pay any of the *510 administrative expenses of the general average. It had mistakenly paid barge repair costs, salvage expenses and legal fees on theories of general average and cannot recover those payments.
20. The only items of provable damages before the Court are the loss of cargo in the amount of $85,852.74, pollution and cleanup costs of $19,261.10 and towing costs for the CHICOPEE and JAGUAR of $12,229.60 ($6,114.80 each), totalling $117,343.44.
21. The parties stipulate that prejudgment interest shall be assessed at the rate of ten (10) percent per annum, which is in accord with the general rule in admiralty cases. Consolidated Grain & Barge Co. v. Archway Fleeting & Harbor Service, 712 F.2d 1287, 1289-90 (8th Cir.1983).
22. Third-party defendant Apex is not liable to either party in this instance. The plaintiff American is the insurer of Apex and its subrogee. As such it holds the same position as Apex and is subject to the same defenses which could be imposed against Apex. Omaha Indemnity Co. v. Johnson & Towers, Inc., 599 F.Supp. 215, 218 (E.D.N.Y.1984). To the extent that the MAYA is unseaworthy, the claim of American must be diminished accordingly.
23. Nor can plaintiff, as insurer of Apex, recover from its own insured. Frank Briscoe Co. v. Georgia Sprinkler Co., 713 F.2d 1500, 1502 (11th Cir.1983); Atlas Assurance Co. v. Harper, Robinson Shipping Co., 508 F.2d 1381, 1389 (9th Cir.1975).
24. By reason of the Court's finding of equal liability of L & L in causing the subject casualty, its request for attorneys' fees and expenses will be disallowed. See E.I. DuPont DeNemours & Co. v. Riverway Harbor Service, 639 F.2d 404, 407 (8th Cir.1981).
Based on the forgoing, judgment will be entered on plaintiff American's complaint for plaintiff American and against defendant L & L for one half the sum of $117,343.44 or $58,671.72 plus prejudgment interest at the rate of 10% per annum. Judgment will be entered on defendant/third-party plaintiff L & L's complaint for third-party defendant Apex and against defendant/third-party plaintiff L & L.
NOTES
[1] Apex Oil Co. and its subsidiary Apex R.E. & T, Inc. are the subject of Chapter 11 bankruptcy proceedings. The case under consideration by this Court was tried and submitted to the Court prior to the Chapter 11 petition. The Court may therefore proceed to rule on this case and is not precluded from doing so under the automatic stay of the Bankruptcy Court. In re Wilson, 72 B.R. 956 (Bankr.M.D.Fla.1987); In re Anderson, 62 B.R. 448 (Bankr.D.Minn.1986).
[2] The fees are $14,287.17 to the firm of Hill, Rivkins, Carey, Loesberg, O'Brien & Mulray and $16,052.32 to the firm of Bigham, Englar, Jones & Houston.