**AMERICAN HOME ASSURANCE CO., Appellant,**

v.

**L & L MARINE SERVICE, INC., Appellee.**

No. 88–2074.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1988.

Decided July 6, 1989.

Rehearing Denied July 7, 1989.

---

**1352**

Joseph A. Murphy and Peter M. Maginot, St. Louis, Mo., for appellant.

James W. Herron, St. Louis, Mo., for appellee.

Before ARNOLD and JOHN R. GIBSON, Circuit Judges, and BRIGHT, Senior Circuit Judge.

ARNOLD, Circuit Judge.

This admiralty case arises from the grounding of the barge APEX CHICAGO and the tugboat MAYA off the coast of Massachusetts on October 19, 1981. Both the barge and the tug were under charter to Apex R.E. & T. Inc., (Apex Towing), a subsidiary of Apex Oil Co. (Apex Oil). Both corporations were insured for this voyage by American Home Assurance Co. (American Home). After paying several settlements on claims relating to the accident, American Home brought this suit against L & L Marine Service, Inc. (L & L), the Missouri corporation which provided a crew for the tug MAYA under contract with Apex Towing. As subrogee of Apex Towing and Apex Oil, American Home seeks to recover for the negligent operation of the MAYA by L & L's crew.

The District Court[1] found that the accident was caused equally by the negligent navigation of the MAYA by L & L's crew and the unseaworthy condition of the tug provided by Apex Towing. *American Home Assurance Co. v. L & L Marine Service*, 688 F.Supp. 502, 507 (E.D.Mo. 1988). The Court awarded judgment to American Home for one-half of the sum of provable damages, a sum which the District Court calculated at $58,671.72, plus prejudgment interest. On appeal, American Home argues that the District Court clearly erred in finding the MAYA unseaworthy, and in assessing Apex Towing's resulting proportionate fault in the accident to be equal to that of L & L's crew. American Home further argues that the District Court erred in reducing or disallowing recovery for certain operations in the rescue of the grounded craft, such as the towing of the grounded barge by a nearby tugboat, the lightering (or transfer) of the APEX CHICAGO's cargo to another barge, and the repairs made on the APEX CHICAGO's hull. With one exception, we affirm the conclusions of the District Court. Insofar as the District Court excluded the costs of lightering the APEX CHICAGO's cargo and repairing its hull from the subtotal of provable damages, we vacate its decision and remand for further proceedings to determine whether the lightering and repair costs should be included in the damages.

### I.

On the night of October 18–19, 1981, the tug MAYA was towing the barge APEX CHICAGO from Carteret, New Jersey to Boston, Massachusetts. The APEX CHICAGO carried a cargo of 1.76 million gallons of unleaded gasoline owned by Apex Oil. The crew of the MAYA were employees of L & L, which operated the barge and tug under agreement with Apex Towing. Both the barge and tug were owned by Central Barge & Boat Co., which chartered them to Apex Towing.

---

1. The Hon. George F. Gunn, Jr., United States District Judge for the Eastern District of Missouri.

The vessels' anticipated route from Carteret to Boston went through Long Island Sound, waters which are protected from the higher seas and more adverse weather of the Atlantic Ocean, then through the unprotected passages of Block Island Sound and Rhode Island Sound, and finally to Buzzard's Bay on the Massachusetts Coast, which leads to Cape Cod Canal and Boston Harbor.

Throughout the preceding day, October 18th, the National Oceanic and Atmospheric Administration (NOAA) had issued small-craft advisories warning of increasingly rough weather along the route of the MAYA. The crew of the MAYA nevertheless left the protected waters of Long Island Sound and ventured into the higher seas of Block Island Sound and Rhode Island Sound. By 6:00 p.m. on October 18, NOAA had upgraded the small-craft advisory in effect for that portion of the Atlantic Coast to gale warnings of winds of 20 to 35 knots. Instead of returning to protected waters, the crew of the MAYA continued to make for Buzzard's Bay.

At the time, the MAYA was towing the APEX CHICAGO with a towing cable mounted on a winch on the MAYA's exposed stern. The cable had a breaking strength of 133,000 pounds, a strength which both parties' expert witnesses would later testify was significantly lower than the breaking strength required under industry standards. Furthermore, the tow cable was let out to only half of its 1500–foot length throughout the journey. In severe weather, the stress on the towing cable could have been reduced by letting the cable out to its full length. The crew was prevented from doing this, however, by an antiquated manual release mechanism on the towing winch, which exposed crew members attempting to let out more cable to serious danger in rough weather.

In the early morning hours of October 19th, the MAYA continued to make its way through Rhode Island Sound toward Buzzard's Bay into increasingly severe weather, with winds up to 35 knots and seas of eight to ten feet. The squalls were intermittently so intense that the MAYA's radar became inoperative, and visibility approached zero. At about 12:45 a.m., the tow line to the APEX CHICAGO broke. Because of the intensity of the storm, the crew did not discover that the barge had come adrift until thirty minutes later. The MAYA then doubled back to retrieve the barge. By 2:30 a.m., the crew of the MAYA sighted the APEX CHICAGO aground on the Hen and Chickens Shoals, one mile off the Massachusetts coast, leaking gasoline through a gash in its hull. In attempting to pull the barge from the rocks, the tug further damaged the barge by backing into its bow. The MAYA's fuel filters became clogged during this rescue attempt, and the tug went out of control, leaving both the MAYA and the APEX CHICAGO aground on the Hen and Chickens rocks.

The stranded tug and barge were finally freed when a Coast Guard vessel arrived, along with two privately owned tugs, the CHICOPEE and the JAGUAR. The Coast Guard vessel attached a floating hawser to the MAYA, which was then towed into open water by the JAGUAR. After the MAYA similarly pulled the APEX CHICAGO into open water, the JAGUAR and CHICOPEE towed the two vessels to port. The APEX CHICAGO's cargo of gasoline was lightered, or transferred, to the barge PRINCESS B. for completion of the voyage.

In the aftermath of the accident, American Home paid several sizeable claims to, or on behalf of, Apex Oil. American Home paid a total of $105,113.84 to Apex Oil under its cargo insurance policy for the gasoline lost in the accident and the cleanup required after the spill. After the marine insurance brokerage firm for Apex Oil, Johnson & Higgins, apportioned the cost of the various charges resulting from the accident between Apex Oil and the owner of the vessels, Central Barge & Tug, American Home paid $48,011.65 for Apex Oil's apportioned share of the cost of repairing the APEX CHICAGO's hull. American Home also paid $41,572.12 for Apex Oil's portion of the charges for lightering its cargo to the PRINCESS B. Finally, American Home defended two widely dissimilar claims from the owners of the tugs which assisted the stranded vessels. The owner of the CHICOPEE submitted a bill for

$6,114.80 for towing services, while the owners of the JAGUAR claimed a much higher sum for salvage. After an arbitration before the American Institute of Marine Underwriters which sustained the JAGUAR's claim, American Home paid $47,190.73 for its share of the salvage claim. L & L did not participate in any proceedings arbitrating claims or adjusting the proportionate cost between the owners of the cargo and the owners of the vessels.

American Home then brought this action against L & L to recover for the damages resulting from the accident, which American Home alleges was proximately caused by the negligent operation of the MAYA by L & L's crew. After trial, the District Court found that the accident was caused equally by negligent navigation by L & L's crew and by the unseaworthy condition of the MAYA's understrength towing cable and defective stern winch. The Court accordingly held L & L liable for one-half of the damages of the accident, which it calculated as one-half the total paid by American Home for loss of cargo, pollution and clean-up costs, and the towing charges for the CHICOPEE and the JAGUAR. The Court held, however, that the settlement paid on the JAGUAR's salvage claim was excessive, in that the JAGUAR was engaged in towage only, and not salvage. As a result, the District Court limited American Home's recovery for the cost of the JAGUAR's services to the same towage charge for $6,114.80 submitted by the CHICOPEE. The Court did not include the costs of lightering or hull repair paid by American Home in the total of provable damages.

## II.

■ On appeal, American Home challenges the District Court's conclusion that the MAYA was unseaworthy and that its unseaworthiness was as much a proximate cause of the accident as the crew's negligence. We review these factual conclusions only for clear error, and we find no such error here.

The essence of American Home's position is that the MAYA is not a coastal tug designed to operate in unprotected waters during rough weather, and so Apex Towing (in whose shoes American Home now stands) should not be charged with providing an unseaworthy vessel when L & L's crew negligently ventured into weather conditions for which the MAYA was not designed. American Home's argument thus assumes that the seaworthiness of the MAYA is a measure of the vessel's fitness when handled under normal conditions by a sufficiently prudent crew.

This approach unjustifiably makes the extent of Apex Towing's duty to provide a seaworthy vessel a function of her crew's skill and foresight in navigation. This is not the law. Unlike the duty of reasonable care which governs the conduct, e.g., of L & L's crew, the duty of the owner (or charterer) to provide a seaworthy vessel is "absolute ..., a species of liability without fault ... [which is not] limited by conceptions of negligence...." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 549, 80 S.Ct. 926, 932, 4 L.Ed.2d 941 (1960) (citations omitted). This absolute duty is not qualified by an assumption that the crew will navigate the vessel out of harm's way. Undoubtedly, many maritime accidents involving unseaworthy ships might have been avoided if their crews had compensated for the unfitness of the vessel by navigating with heightened caution. But the vessel owner's (or in this case, charterer's) strict liability for the seaworthiness of the vessel is defined only by reference to the vessel's intended voyage, the hazards likely to be encountered, and the vessel's ability to withstand these hazards. See *Walker v. Harris*, 335 F.2d 185, 191 (5th Cir.), *cert. denied*, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964).

In this case, Apex Towing intended the MAYA to complete a coastal voyage from New Jersey to Boston Harbor. This voyage required the MAYA to pass through the unprotected waters of Rhode Island Sound to reach Buzzard's Bay. It is obvious that this passage could have been completed more safely if L & L's crew had waited out the storms of October 18–19 in Long Island Sound, and that (as the District Court found) the crew's behavior in

handling the vessels was negligent. This fact does not excuse Apex Towing from the duty to provide a vessel fit to weather such storms, which the District Court found were not so unusual in these waters as to be unforeseeable.

Furthermore, American Home does not specifically challenge the District Court's conclusion, based on expert testimony, that the MAYA's towline was substantially understrength and that its obsolete stern winch prevented the crew from safely letting out more line. While this substandard equipment might never have been put to the test if the crew had prudently waited out the storm in sheltered waters, it is equally true that the crew's decision to make for Buzzard's Bay might not have been so disastrous if Apex Towing had provided sufficiently strong cable on a winch which could have safely let the tow line out to its full length. We have no reason to question the District Court's conclusion that the MAYA's towline and winch were unfit to weather foreseeable hazards along its intended route, or that this unseaworthiness contributed equally to the accident with the crew's negligence. *Cf. Consolidated Grain & Barge Co. v. Archway Fleeting & Harbor Service,* 712 F.2d 1287, 1289 (8th Cir.1983).[2]

### III.

■ Next, American Home argues that the District Court should have allowed the full amount of the JAGUAR's salvage claim in calculating damages, rather than limiting the damages attributable to this expense to the same towage charge submitted by the CHICOPEE. American Home tacitly concedes that L & L is not bound by the results of the arbitration under which American Home paid $47,190.73 on the JAGUAR's salvage claim. Whether this salvage payment was appropriate, and therefore chargeable as damages against L

**2.** American Home also argues that the cargo owner, Apex Oil, is innocent of any fault attributable to its subsidiary Apex Towing, and reasons that Apex Oil should recover its entire damages from L & L, the negligent party. We disagree. The cargo was injured, so to speak, by two causes: the negligence of L & L, and the unseaworthiness of the tug MAYA, chartered by

& L, depends on whether the JAGUAR actually performed a salvage operation, a conclusion the District Court rejected. We review the District Court's factual finding on this matter only for clear error.

American Home argues that the predicament of the MAYA and the APEX CHICAGO, as they were aground on the Hen and Chickens rocks with gasoline leaking into the surf, certainly constituted a marine peril from which they were saved. American Home reasons that the JAGUAR's voluntary and successful rendering of a noncontractual service under these circumstances establishes its salvage claim as a matter of law within the definition of *The Sabine,* 101 U.S. 384, 25 L.Ed. 982 (1879). This argument would have some merit if the record clearly established that the JAGUAR had been responsible for the operation which rescued MAYA and the APEX CHICAGO from peril. Here, however, it appears that it was the Coast Guard vessel on the scene which actually performed the crucial act of rescue by attaching the floating hawser to the MAYA.

We are left with two diverging interpretations of the JAGUAR's role in the operation. It is true that the JAGUAR, rather than the Coast Guard vessel, actually pulled the MAYA off the shoal, but this operation involved a simple act of towing, and depended on the Coast Guard vessel's prior, and much more dangerous, attachment of the hawser. In this case, the expert witnesses for both parties agreed that the JAGUAR performed no more work than the larger CHICOPEE, and that the work of both tugs was properly characterized as towage rather than salvage. Tr. 97–99, 168–69. At least one expert witness reached this conclusion after reviewing videotapes of the action. In the face of this evidence in the record, we have no reason to reject the District Court's finding as clearly erroneous.

Apex Towing. Under established admiralty principles, L & L's liability for damages is assessed in proportion to the comparative degree of its fault. *United States v. Reliable Transfer Co.,* 421 U.S. 397, 411, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975). Apex Oil is only entitled to recover half its damages from L & L.

### IV.

Finally, American Home argues that the District Court should have included the costs of lightering the APEX CHICAGO's cargo and repairing its hull in the calculation of damages. Unfortunately, both parties have needlessly muddled the issue of damages by applying the theory of the general average in calculating L & L's liability.

 The concept of general-average adjustment does not apply in this case. The rules governing the distribution of maritime loss among the various vessel and cargo interests, known as general-average rules, apply only when one party has taken action for the common safety of vessel and cargo. See *Orient Mid–East Lines v. A Shipment of Rice*, 496 F.2d 1032, 1038 (5th Cir.1974), *cert. denied*, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975). In such a case, the party making a sacrifice or incurring a cost for the common good, whether vessel owner or cargo owner, may obtain compensation under the general-average rules for the sacrifice or expense from the other affected interests who have shared the benefit. Here, for example, the vessel owner, Central Barge, and the sole cargo owner, Apex Oil, declared a general average and apportioned between themselves the costs of hull repair and lightering. The method by which the parties divided the cost of preserving their intertwined interests is irrelevant, however, in a tort action brought against the third party who (partially) caused the accident to begin with. In this case, L & L is neither a vessel interest nor a cargo interest. L & L obtained no benefit cognizable under the general-average rules from any cargo lightering or hull repair. Indeed, L & L's interests would not have been affected if the MAYA, the APEX CHICAGO, and all of its cargo had been lost entirely, assuming its employees were rescued. As a result, it is inappropriate to speak of collecting L & L's contribution in general average for sacrifices which did not benefit it, in a venture in which it owned neither vessel nor cargo. Neither is L & L's liability affected by the method used by the other parties to adjust the damages among themselves.

L & L is not being sued as a contributing participant in a common nautical venture; it is being sued as a tortfeasor. The only conceivable basis for recovery in this lawsuit is the basic tort principle in admiralty law that

when two or more parties have contributed by their fault to cause property damage in a marine collision or stranding, liability for such damages is to be allocated among the parties proportionately to the comparative degree of their fault....

*United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975). This principle applies to barge accidents caused equally by negligent tug navigation and unseaworthiness of the vessels. See *Consolidated Grain & Barge, supra*, 712 F.2d at 1289. In this case, L & L is liable for one-half of the damages resulting from the accident which the negligence of its crew partially caused. On this record, we do not understand why the costs of hull repair and cargo lightering[3] would not be items of provable damages for which L & L is (halfway) liable. Since the District Court did not specifically explain why these costs were excluded from the list of damages, we vacate its damage award insofar as the costs of cargo lightering and hull repair are not included. On remand, the District Court should reconsider whether these items may be chargeable as damages under *Reliable Transfer, supra*.[4]

Affirmed in part, vacated in part, and remanded.

It is so ordered.

---

**3.** In this action, the relevant costs would be only that portion of the costs of lightering and hull repair actually borne by the insurer, American Home. This, in turn, would require proof of amounts actually paid by American Home pursuant to its general-average adjustment with Central Barge.

**4.** In its petition for rehearing, L & L urges that lightering charges claimed by American Home have not been proved, and that hull repair costs paid by American Home were not covered under Apex Oil's cargo policy. We express no opinion as to the merits of these arguments, and leave them for the District Court to evaluate in light of this opinion. American Home's and L & L's petitions for rehearing are denied.