725 F.Supp. 440 (1989)
LONE STAR INDUSTRIES, INC., Plaintiff,
v.
MAYS TOWING COMPANY, INC., Defendant.
No. S 86-149 A (5).
United States District Court, E.D. Missouri, Southeastern Division.
June 28, 1989.
On Motion to Alter or Amend Judgement October 18, 1989.
William R. Bay, Thompson and Mitchell, St. Louis, Mo., for plaintiff.
*441 Gary T. Sacks, Goldstein & Price, St. Louis, Mo., for defendant.

MEMORANDUM
LIMBAUGH, District Judge.
Plaintiff Lone Star Industries, Inc. (Lone Star) filed this action against defendant Mays Towing Company, Inc. (Mays) pursuant to the Court's admiralty and maritime jurisdiction, 28 U.S.C. § 1333. Lone Star seeks damages arising out of the sinking of its barge, which it alleges was the result of negligent towing by Mays. This Memorandum constitutes the Court's findings of fact and conclusions of law for the purpose of Fed.R.Civ.P. 52(a).

I. Findings of Fact.

Plaintiff Lone Star Industries operates a cement manufacturing facility in Cape Girardeau, Missouri. In 1982, Lone Star purchased the facility from the Marquette Company, which had operated the cement plant there for many years. In the early 1950s, Marquette contracted with a barge builder to build a certain type of doublerake closed hopper barges, designed specifically for the purpose of hauling cement. These barges were known as the 1500 series, and have been used by Marquette, and later by Lone Star, for the hauling of cement for nearly 40 years.
There was evidence that in 1980, prior to Lone Star's acquisition of Marquette, Mays entered into a contract with Marquette to tow its cement barges from Cape Girardeau to Marquette's unloading facility in Memphis, Tennessee, and then back to Cape Girardeau for another trip. It was not disputed at trial that Lone Star and Mays continued to operate under the same contract after Lone Star purchased the facility from Marquette. The contract apparently included some form of indemnity agreement, but neither party could produce a copy of the final executed contract.
Plaintiff's Exhibit No. 5 is a copy of a document entitled "Towage Agreement" between Marquette and Mays. The document was signed by a representative of Marquette, but it was not signed by anyone on behalf of Mays. Defendant's president, Edward Mays, testified at trial that he could not identify Plaintiff's Exhibit No. 5 as being identical to the contract he signed with Marquette. The Court finds, therefore, that the exhibit is not admissible because it lacks authenticity and does not qualify as a "duplicate" under Fed.R.Evid. 1001(4).
Absent a contract for indemnity, the Court will proceed with the findings of fact relative to plaintiff's negligence claim. Mays regularly used two motor vessels, the M/V PEGGY MAYS and the M/V SHERRY K. MAYS, for towing Lone Star's barges to Memphis for unloading and returning them to Cape Girardeau. On December 23, 1983, Mays constructed a tow consisting of three of Lone Star's 1500 series barges: LS 1501, LS 1502 and LS 1503. The tow arrived in Memphis on December 25, 1983. Because of the holiday, the barges were not unloaded until December 28, 1983. Shortly after Lone Star personnel began unloading the LS 1501 barge, they noticed that the barge was sinking. Attempts to salvage the LS 1501 were unsuccessful, resulting in the loss of the barge and approximately 1,100 tons of cement cargo.
The essential dispute concerns which party is at fault for the rupture in the sternlog that caused the LS 1501 to sink. A determination of this issue requires the Court to retrace the handling of the LS 1501 prior to being placed in the Mays tow from Cape Girardeau to Memphis on December 23, 1983, the events that occurred during the trip, and what happened after the barges were docked in Memphis.
On December 17, 1983, the LS 1501 was part of a flotilla of 30 barges returning from Memphis in tow of the M/V MARTHA LYNN, a vessel operated by Mid-South Towing company. The M/V MARTHA LYNN delivered the barge to Cairo, Illinois, where the "Tugboat ANNIE," a harbor tug operated by Waterfront Services Company, removed it and placed it in its fleet of barges for approximately three days. On December 20, 1983, the "Tugboat ANNIE" removed the LS 1501 from its fleet and added it to the tow of the M/V *442 PEGGY MAYS by placing its stern end against the stern end of Barge LS 1502.
After the 1501 was secured in its tow, the M/V PEGGY MAYS departed north to the Lone Star terminal at Cape Girardeau, where it arrived with its tow of three barges (1501, 1502 and 2801) on December 21, 1983. It moored Barges 1501 and 1502 at Lone Star's icebreaker, approximately 100 yards from the dock where cement barges were loaded, and then spotted the empty LS 2801 at the dock for loading. The LS 1501 remained at the icebreaker until mid-morning on December 22, 1983, when it was moved to the loading dock by the M/V CURTIS MOORE, operated by Cape Fleeting, Inc. Prior to loading, Lone Star employees conducted a routine inspection of the barge, which did not show any damage. Loading of the barge was completed in the early morning of December 23, 1983 and the 1501 was returned to the icebreaker by the M/V CURTIS MOORE. The LS 1501 was moored beneath the LS 1502 and to the starboard side of the LS 1503. The barge remained in the fleet at the icebreaker until 6:30 p.m. on December 23, 1983 when the M/V SHERRY K. MAYS arrived.
There is no evidence that the 1501 was damaged when it was placed in the tow of the M/V SHERRY K. MAYS. To the contrary, the evidence presented at trial supports plaintiff's position that the barge was undamaged and in a seaworthy condition when it began the trip to Memphis. The Court finds, therefore, that the damage to the LS 1501 that resulted in the sinking of the barge must have occurred while it was en route to Memphis or after it arrived at Lone Star's Memphis facility for unloading.
Barges 1501, 1502 and 1503 began in tow of the M/V SHERRY K. MAYS to Memphis on December 23, 1983. The tow proceeded south to Cairo, Illinois, where it was joined by the M/V PEGGY MAYS, which positioned itself behind the LS 1503 and along the port side of the M/V SHERRY K. MAYS. When the tow arrived near Columbus, Kentucky, the PEGGY MAYS topped the tow around and nosed its lead barge, the 1502, into the sandmud bank. The SHERRY K. MAYS backed away from the tow and the PEGGY MAYS slid over and behind the stern of the 1501 in order to face up to it.
Dwight Wooten, the captain of the M/V PEGGY MAYS, testified at deposition that the PEGGY MAYS made a "light lick" when it faced up to the 1501. Captain Wooten described this as a "very reasonable face-up." Plaintiff, on the other hand, contends the damage to the LS 1501 occurred when the PEGGY MAYS faced up to it. In reaching this conclusion, plaintiff relies on the definition offered by its expert witness that a lick means you stuck something harder than you intended.
Once the M/V PEGGY MAYS assumed control over the barges at Columbus, the tow remained in the same configuration until it reached Island 39, approximately 15 miles upriver from Memphis. There, the tow was topped around so that the barges could be properly spotted at the dock for unloading. The manuever was accomplished by turning the tow so that it was going north against the current. The PEGGY MAYS then backed away from the LS 1501 and moved to the upstream end of the tow and faced up to the LS 1502. The tow then completed the journey to Memphis, arriving at Lone Star's dock at approximately 2:00 p.m. on December 25, 1983. Because Lone Star's employees were off work for the Christmas holiday, the PEGGY MAYS remained stationary with the crew at leisure until Lone Star's employees returned to work on December 27.
Prior to unloading the barges on December 27, Lone Star's assistant terminal manager, Kenneth Rutledge, visually inspected the outside of the barges and did not see any damage. Because ice had formed on the deck of the barges, Rutledge was unable to remove the hatch covers to inspect the void compartments. Rutledge decided to wait one more day before unloading, hoping that the ice would melt so that he could get inside the compartments. The weather did not moderate, and Lone Star's employees began to unload the LS 1501 on December 28, 1983.
*443 The cargo of cement was unloaded from bow to stern. Consequently, a portion of the sternlog submerged as cement was removed from the bow end of the cargo box. An undetected crack in the sternlog prior to unloading can result in the demise of the barge as the sternlog slips underwater during the unloading process. When barges were unloaded at night, Long Star had just one employee, the pump operator, on duty during the unloading process. The pump operator was positioned inside the pump room on the bow of the barge in order to operate the controls for the unloading machinery. As such, he had limited vision of the outside of the barge and could not see the stern of the barge. Defendant suggests that the better practice  the practice formerly followed by Lone Star  is to employ two persons during the unloading process. Because of the pump operator's limited vision, the helper would be available to spot any problems early on so that corrective action could be taken quickly.
Lone Star was unloading cement from the LS 1501 in the afternoon and evening of December 28, 1983. Phillip Alexander, the day shift pump operator, was relieved by James Kendrick at 8:00 p.m. Kendrick continued to unload cement from his station in the pump room until about 9:00 p.m. At that time, he heard a noise and left the pump room and went onto the dock barge where he observed water over the stern. Kendrick called Rutledge at home and then sought assistance from the crew of the M/V PEGGY MAYS. The efforts to salvage the LS 1501 were unsuccessful, resulting in the loss of the barge and its cargo.

II. Conclusions of Law.

This is an admiralty and maritime claim within the meaning of Fed.R.Civ.P. 9(h), and the Court has subject matter jurisdiction thereof pursuant to 28 U.S.C. § 1333.
Under maritime law, it is well-settled that a barge owner has the duty to furnish his barge for loading in a seaworthy condition. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903). The test for seaworthiness is whether the vessel is reasonably fit to carry the particular cargo which it has agreed to transport. The Southwark, 191 U.S. at 9, 24 S.Ct. at 3; The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241 (1898). The issue of seaworthiness is a question of fact to be decided by the Court. Federal Barge Lines v. Granite City Steel, 608 F.Supp. 142, 147 (E.D. Mo.1985); Dravo Mechling Corp. v. Standard Terminals, 557 F.Supp. 1162, 1166 (W.D.Pa.1983). After reviewing the evidence, the Court has found above that the LS 1501 barge was in a seaworthy condition when placed in defendant's tow.
Defendant Mays Towing Company is neither an insurer nor a bailee, but it is "under a duty to exercise the reasonable care and maritime skill that prudent navigators employ in performing similar services, and the burden of proving negligence is on the party that asserts it." Mid America Transportation Co. v. National Marine Service, Inc., 497 F.2d 776, 779 (8th Cir.1974). Although plaintiff has the burden of proving its claim of negligence, the doctrine of res ipsa loquitur allows the Court to infer negligence where "1) the injured party was without fault; 2) the instrumentality causing the injury was under the exclusive control of the defendant; and 3) the mishap is of a type that ordinarily does not occur in the absence of negligence." Consolidated Grain and Barge Co. v. Huffman Towing Co., 801 F.2d 1072, 1074 (8th Cir.1986) (McMillian, J. dissenting); quoting United States v. Nassau Marine Corp., 778 F.2d 1111, 1115-16 (5th Cir.1985). "If an inference of negligence is justified, then the defendant bears the burden of coming forward with an explanation for the damage sufficient to rebut the inference." Agri-Trans Corp. v. Peavey Co., 742 F.2d 1137, 1139 (8th Cir.1984).
In the instant case, the Court believes the evidence supports an inference of negligence by the defendant. It is not disputed that the damage to the 1501 occurred before the barge was docked in Memphis. In view of the Court's finding that the barge was seaworthy when placed in defendant's custody, the damage necessarily occurred during the voyage between Cape Girardeau and Memphis. This is the *444 very type of case in which the doctrine of res ipsa loquitur was intended to apply, as shown by the fact that the criteria set forth above have been met: first, the injured party, plaintiff Lone Star, was without fault; second, the LS 1501 barge and its tug, the M/V PEGGY MAYS, were under the exclusive control of defendant; and third, the damage to the LS 1501 is of a type that ordinarily does not occur in the absence of negligence.
Because the Court has determined that the evidence supports an inference of negligence, the defendant bears the burden of coming forward with evidence to rebut the inference, Agri-Trans Corp., 742 F.2d at 1139. Mays has failed to meet that burden. Thus, the Court finds that the negligence of Mays Towing Company caused the damage to the LS 1501, resulting in the loss of the barge and its cargo.
It would not be just, however, to penalize defendant for losses that may have been prevented had Lone Star taken the appropriate actions during the unloading process. The allocation of damages is appropriate when the actions of more than one party have contributed to the loss. American Home Assurance Co. v. L & L Marine Service, Inc., 875 F.2d 1351, 1356 (8th Cir.1989); Prudential Lines, Inc. v. McAllister Brothers, Inc., 801 F.2d 616, 621 (2d Cir.1986); Hercules, Inc. v. Stevens Shipping Co., 765 F.2d 1069, 1075 (11th Cir.1985).
The Court finds that Lone Star contributed to the loss of the LS 1501 and its cargo in two ways. First, plaintiff's employees failed to inspect the void compartments because ice covered the hatches. Lone Star knew that the sternlog would submerge as the cement was unloaded from the bow end of the cargo box. This made it important to know for sure prior to unloading that the sternlog had not been ruptured. Lone Star could have taken other steps to open the hatches, but it failed to do so. The second way Lone Star contributed to the loss was by having only one person on duty during the unloading process. Although the crew members of the M/V PEGGY MAYS were on standby, they were only required to assist after a request was made, and they were not on the dock or the deck of the LS 1501 while it was being unloaded. Because Lone Star's pump operator, Kendrick, was positioned inside the pump room on the bow of the barge, he could not see the stern of the barge. Any corrective action that might have been taken to prevent the sinking of the 1501 was delayed until Kendrick heard a noise that prompted him to leave the pump room, only then discovering that there was water coming over the stern.
The Court does not believe Lone Star was at fault for removing and not replacing the inspection plate. The evidence at trial supports plaintiff's contention that only a small amount of water would have entered the cargo compartment because of the failure to replace the inspection plate. The inspection plate was not a contributing cause of the sinking.
Comparatively, the Court assesses the fault of defendant Mays at sixty percent and the fault of plaintiff Lone Star at forty percent. Therefore, the damages to be awarded to Lone Star will be diminished by forty percent in accordance with the Court's assessment of Lone Star's fault.
Finally, the Court must consider Lone Star's damages. Estimates as to the value of the LS 1501 range from $30,000.00 by the defendant to $500,000.00 by the plaintiff. The evidence at trial was that the barge was nearly 35 years old in December of 1983, and had been repaired on many occasions. The Court assesses the value of the LS 1501 at $35,000.00. Also lost was approximately 1,100 tons of cement cargo. The Court will accept plaintiff's estimate that the value of the cement was $55,000.00. In addition, the Court will award plaintiff $180,394.15 in expenses that were necessarily incurred due to the sinking of the LS 1501. In defendant's response to requests for admissions filed December 9, 1987, Mays admitted that those expenses were fair and reasonable and necessarily incurred by plaintiff. The total damages, therefore, are $270,394.15. This amount is reduced by forty percent to reflect the Court's assessment of plaintiff's fault. Accordingly, *445 judgment will be entered in favor of plaintiff in the amount of $162,236.49.
In addition to the judgment of $162,236.49, Lone Star is entitled to prejudgment interest from December 28, 1983. "The purpose of awarding prejudgment interest in admiralty suits is to compensate the injured party in full, and prejudgment interest should be awarded in the absence of exceptional or peculiar circumstances." SCNO Barge Lines, Inc. v. Sun Transportation Co., 775 F.2d 221, 227-28 (8th Cir. 1985). There are no circumstances present here that justify the denial of prejudgment interest. Accordingly, prejudgment interest will be awarded.

MEMORANDUM AND ORDER

ON MOTION TO ALTER OR AMEND JUDGMENT
Plaintiffs filed this action against defendant seeking damages arising out of the sinking of plaintiff's barge. On June 28, 1989, the Court entered judgment in favor of plaintiffs and against defendants on the merits of plaintiff's complaint. This cause is before the Court on defendant's motion to alter or amend the judgment regarding the award of prejudgment interest. The Court awarded damages totalling $162,236.49 plus prejudgment interest from the date of the casualty. The Court's award of damages consisted of $35,000 (the value of the barge), $55,000 (the value of the barge's cargo), and $180,394.15 (expenses that were necessarily incurred by plaintiff due to the casualty). The Court then reduced the damages by 40% to reflect the comparative fault of plaintiff. Defendant seeks to alter or amend the award of prejudgment interest on three grounds.
First, defendant seeks to amend the Court's award of prejudgment interest on the total amount of damages from the date of the casualty. A significant portion of plaintiff's damage award consisted of compensation for expenses necessarily incurred by plaintiff due to the casualty. Defendant asserts that since these expenses were paid by plaintiff after the date of the casualty, the award of prejudgment interest should be calculated from the date of plaintiff's payment rather than from the date of the casualty. In Federal Barge Lines, Inc. v. Republic Marine, Inc., 616 F.2d 372 (8th Cir.1980), the court stated: "[P]rejudgment interest is to be computed from the time expenditures were actually made, i.e., [sic] the time of payment." 616 F.2d at 373 (citing Mid-America Transportation Co., Inc. v. Cargo Carriers, Inc., 480 F.2d 1071, 1074 (8th Cir.1973); Mid-America Transportation Co., Inc. v. Rose Barge Lines, Inc., 477 F.2d 914, 916 (8th Cir.1973)). The Court concludes that for the amount of the damage award that is allocated to expenses rather than to the value of the barge or its cargo, prejudgment interest should be calculated from the date of payment rather than from the date of the casualty. The Court grants defendant's motion to alter or amend the judgment with regard to the date from which prejudgment interest is calculated.
Second, defendant asserts that plaintiff should be denied its award of prejudgment interest because the Court only awarded plaintiff 21.5% of the damages it sought. An "award of prejudgment interest, in the absence of statutory directives, rests in the discretion of the district court." Cargill, Inc. v. Taylor Towing Serv., Inc., 642 F.2d 239, 241 (8th Cir.1981). "Prejudgment interest is to be awarded whenever damages lawfully due are withheld, unless there are exceptional circumstances to justify the refusal." Id. at 242. Defendant asserts that an award of damages which is substantially less than the damages claimed by plaintiff is an exceptional circumstance justifying refusal. In Cargill the Court reversed the district court's decision to deny an award of prejudgment interest on the ground that plaintiff had unduly inflated his claim. Id. Therefore, defendant's motion to alter or amend the award of prejudgment interest because plaintiff overstated its damages is denied.
Third, defendant asserts that plaintiff should only be awarded prejudgment interest from the date that the suit was filed because plaintiff brought suit 2¼ years after casualty. In Federal Barge Lines, *446 Inc. v. Granite City Steel, 608 F.Supp. 142, 151 (E.D.Mo.1985), aff'd in part, 809 F.2d 497 (8th Cir.1987), this Court held that a 3½ year delay between the casualty and the filing of the complaint did not constitute an exceptional circumstance to justify the denial of prejudgment interest. The Court concludes that the 2¼ year delay in filing a complaint is not sufficient to justify either the total denial of prejudgment interest or altering the Court's judgment that prejudgment interest runs from the date of the casualty for damages allocated to the value of the barge and its cargo. Therefore, defendant's motion to alter or amend the judgment to award prejudgment interest only from the date the complaint was filed is denied.
Accordingly,
IT IS HEREBY ORDERED that defendant's motion to alter or amend the judgment is GRANTED in part and DENIED in part.