# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3144

_____

| | | |
|---|---|---|
| Daniel Doyle; Anne Doyle, | * | |
| | * | |
| Plaintiffs/Appellees, | * | |
| | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Nebraska. |
| Leland Graske, | * | |
| | * | |
| Defendant/Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Jason R. Haynes; Caribe Inflatables | * | |
| USA, Inc.; Kirk Marine, | * | |
| | * | |
| Third Party Defendants. | * | |
| | * | |
| | * | |

_____

Submitted: April 16, 2009
Filed: September 2, 2009
Amended: October 21, 2009

_____

Before LOKEN, Chief Judge, HANSEN and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Daniel Doyle suffered injuries while he was a passenger on a boat owned and operated by Leland Graske. Doyle and his wife brought an action in Nebraska state court, claiming that Graske was negligent in his operation of the boat. Graske removed the case to federal district court, invoking admiralty jurisdiction. Removal based on admiralty jurisdiction was improper under 28 U.S.C. § 1441, *see Romero v. International Terminal Operating Co.*, 358 U.S. 354, 371-72 (1959), but the Doyles waived their objection to improper removal by failing to seek a remand to state court, and the district court properly exercised jurisdiction over claims that could have been brought originally in federal court. *See Grubbs v. Gen. Elec. Credit Corp.*, 405 U.S. 699, 702 (1972); *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1069 (9th Cir. 2001). The district court, sitting without a jury, found that Doyle's injuries were caused by Graske's negligence, and awarded compensatory damages to Doyle, as well as loss-of-consortium damages to his wife, Anne. We affirm the district court's judgment in favor of Daniel Doyle, but reverse its award of loss-of-consortium damages to Anne Doyle.

I.

On October 31, 2003, Graske and two friends, Daniel Doyle and Robert Van Hook, decided to go fishing in the waters off the coast of Grand Cayman Island, where Graske owned a vacation home. The three set out on Graske's inflatable boat at around 10:30 a.m. The boat was fourteen feet long, with a seventy-horsepower engine and room for six passengers. It featured two seats at the stern (or rear), two more at midship, and a cushion for two passengers at the bow (or forward end). Both seats at the stern faced forward and included backrests. The stern seat on the starboard side (*i.e.*, the right side while looking forward) was known as the "helm seat" because of its position opposite the boat's steering wheel, located on a console at midship. The forward side of the console functioned as a backrest for the starboard midship seat. The other midship seat (on the port, or left, side) and the bow cushion seats did not have backrests, and passengers sitting on the latter had to ride facing the rear. An

-2-

inflatable tube formed most of the boat's hull, and there were hand straps along the top of the tube for passengers sitting at midship or in the bow.

From the helm seat, Graske steered the boat slowly through the no-wake zone – a zone extending two hundred yards from shore in which boats are prohibited from traveling above five miles per hour.  When the boat was past the zone, Graske said, "Here we go," or words to that effect, and began accelerating.  As the boat came on plane – that is, reached a speed at which its hull was no longer displacing the water, but skimming across it – a nylock nut came loose from the boat's steering system, causing the system to malfunction and the boat to turn abruptly and sharply to the left.

Despite the sudden turn, Graske was able to maintain his position behind the steering wheel.  Van Hook, who was sitting on one of the midship seats, managed to remain on the boat as well.  Doyle, however, was thrown overboard.  Accounts differ concerning where Doyle was located when he was ejected.  According to Graske, Doyle was sitting on the inflatable tube, with his feet between the starboard midship and bow seats, and with at least one hand on a hand strap.  According to Van Hook, Doyle was seated on the bow cushion (having moved there from the tube), and was not holding any hand strap.  Doyle himself cannot remember.

Wherever he was sitting, Doyle was thrown into the water, and as the boat continued turning counterclockwise, it struck him in the back and on the head.  Graske immediately put the boat in neutral.  Doyle was some distance from the boat, injured but conscious.  Graske brought the boat closer to Doyle, and Van Hook grabbed hold of him, eventually pulling him onto the inflatable tube.

Graske guided the boat to shore.  From there, Doyle was transported to a local hospital and then transferred to medical facilities in the United States.  Doctors diagnosed him with a flail chest, his respiration hindered by multiple rib fractures.

Because of difficulties breathing, Doyle suffered permanent brain injury while hospitalized.

Doyle brought an action against Graske in Nebraska state court, claiming negligence in Graske's operation of the boat. Graske removed the case to federal district court, invoking admiralty jurisdiction under 28 U.S.C. § 1333(1). He sought to implead several third-party defendants, including a mechanic who repaired and reassembled the boat's steering system just days before the accident. Graske, however, was unable to establish personal jurisdiction over the third-party defendants, and his claims were ultimately dismissed without prejudice. Doyle filed an amended complaint, adding his wife, Anne, as a plaintiff.

Following a bench trial, the district court entered judgment in favor of the Doyles. Applying general maritime law, the court found that Graske was negligent in his operation of the boat, and that Graske's negligence was a proximate and substantial cause of Doyle's injuries. It also determined that Doyle's own negligence contributed to his injuries, because he should have been more aware of the dangers around him. The court apportioned ninety percent of the fault for Doyle's injuries to Graske and potential tortfeasors, including the mechanic, and the remaining ten percent to Doyle himself. Taking account of Doyle's comparative negligence, the court awarded $3,238,153 in compensatory damages to Doyle. It also awarded $750,000 in damages for loss of consortium to Anne, but that amount did not reflect any proportional reduction for Doyle's comparative fault. Graske appeals.

II.

Graske first challenges the district court's finding that he was negligent in the operation of the boat. Because negligence in admiralty is a factual determination, we may not set aside the district court's finding unless it is clearly erroneous. *McAllister v. United States*, 348 U.S. 19, 20 (1954). "A finding is clearly erroneous when

although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *Id.* (internal quotations omitted).

Under general maritime law, a boat owner owes a duty of reasonable care to passengers lawfully aboard his boat. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959). The district court found that Graske breached this duty by bringing the boat on plane while Doyle was seated in "a position of danger." The court acknowledged that according to Graske, Doyle was sitting on the tube when the accident occurred, whereas according to Van Hook, Doyle was sitting on the bow cushion. But the court determined that this difference of opinion was immaterial, because "both the tube and the bow cushion seat are positions of danger while accelerating a small watercraft on the open ocean." Given that Doyle was sitting at either one position or the other, the court reasoned that Graske should have known that it was unsafe to accelerate. Accordingly, the court concluded that by bringing the boat on plane, Graske failed to exercise reasonable care for Doyle's safety, and was thus negligent in his operation of the boat.[1]

Graske does not dispute that his actions were negligent if Doyle was sitting on the tube. Indeed, various boating experts testified at trial that sitting on the tube was unsafe while the boat was planing, and there was no testimony to the contrary. Graske focuses instead on the district court's finding that his operation of the boat was negligent if Doyle was sitting on the bow cushion. Graske argues that this finding is clearly erroneous. We disagree.

---

[1]Graske contends that the district court abused its discretion by failing to make a specific finding of fact as to where Doyle was sitting when the accident occurred. Because Doyle's exact seating position is not an ultimate fact necessary to reach a decision, we reject Graske's contention. *See Allied Van Lines, Inc. v. Small Bus. Admin.*, 667 F.2d 751, 753 (8th Cir. 1982).

At trial, Michael Sampsel, a mechanical and marine engineer, testified that the bow cushion was an unsafe position while the boat was on plane. Sampsel noted that the cushion was naturally subject to greater motion at higher speeds, given its location in the boat's bow. According to Sampsel, however, the cushion's design did not account for such increased motion. Quite the opposite, he explained, the cushion's short height – just 13.5 inches above the deck – meant that passengers would be sitting in an unusual posture, with their knees higher than normal. He also noted that the lack of thigh restraints or backrests meant that passengers would be prone to sliding across the cushion. Sampsel acknowledged the presence of nearby hand straps, but maintained that they were meant for use in lifting the boat, not for use by passengers. In Sampsel's opinion, therefore, the bow cushion's location and design rendered the seat unsafe while the boat was on plane, and Graske violated safe boating practices if he proceeded to accelerate with Doyle sitting there.

The testimony of two other experts was not inconsistent with Sampsel's conclusion. Paul Larson, a marine surveyor and investigator, testified that when the boat was planing, a seat at midship was "a better and safer position" than one in the bow. He did not rule out the possibility that if Doyle was seated on the bow cushion when the accident occurred, then Graske's operation of the boat was negligent. According to Larson, whether Graske failed to exercise reasonable care would depend on the circumstances. Herbert Angell, a boating law administrator for the State of Nebraska, took a similar position. Like Larson, Angell testified that whether it was negligent to allow Doyle to sit on the bow cushion would depend on how fast the boat was traveling and other environmental conditions.

The only expert witness who stated categorically that sitting in the bow was safe at planing speed was Robert MacNeill, a boat manufacturing consultant. The district court noted, however, that MacNeill's expertise was in designing yachts, not small recreational vessels. The court therefore declined to credit MacNeill's testimony regarding the safe operation of Graske's fourteen-foot boat. Giving due

deference to the district court's determination of credibility, we cannot say that its refusal to accept MacNeill's testimony was unreasonable.

In light of the record as a whole, we conclude that substantial evidence supports the district court's conclusion that Graske breached a duty of reasonable care if Doyle was seated on the bow cushion when the boat came on plane. The definitive testimony of Sampsel, and the fact-dependent opinions of two other experts, provided sufficient basis for the court to find that the bow cushion was a position of danger under the circumstances, such that Graske should have known not to accelerate while Doyle was seated there. Given that the only other position where Doyle could have been located was on the tube – a position Graske does not dispute would have been unsafe – we hold that the district court's finding of negligence in Graske's operation of the boat is not clearly erroneous.

## III.

Graske next challenges the district court's determination that his negligent operation of the boat was a proximate and substantial cause of Doyle's injuries. Issues of proximate causation in admiralty "involve application of law to fact, which is left to the factfinder, subject to limited review." *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840-41 (1996). We may not disturb the district court's determination unless it is clearly erroneous. *Am. Home Assurance Co. v. L & L Marine Serv., Inc.*, 875 F.2d 1351, 1354 (8th Cir. 1989).

Graske invokes the doctrine of superseding cause, arguing that the negligent repair of the boat's steering system superseded his negligent operation of the boat, thereby relieving him of liability for Doyle's injuries. The allegedly negligent repair of the boat, however, could not have been a superseding cause of Doyle's injuries. The doctrine of superseding cause applies "where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought

about by a *later* cause of independent origin that was not foreseeable." *Sofec*, 517 U.S. at 837 (emphasis added) (internal quotation omitted). Here, the allegedly negligent repair of the boat occurred *before* Graske's negligence, and thus could not have superseded it. Accordingly, the doctrine of superseding cause is of no avail to Graske.

Graske also invokes the doctrine of inevitable accident, arguing that Doyle's injuries would have occurred as a result of the failure of the boat's steering system, regardless of whether Graske's operation of the boat was negligent. We doubt that the doctrine of inevitable accident applies outside the context of collision liability, where it may be raised as an affirmative defense by vessels accused of causing collisions. *See The Louisiana*, 70 U.S. (3 Wall.) 164, 173 (1865); Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 7-2, at 486-88 (2d ed. 1975). But even assuming that the doctrine does apply in this general context, it would not apply in this case. An accident cannot be said to have been inevitable if it could have been prevented by "human skill and precaution, and a proper display of nautical skill." *The Louisiana*, 70 U.S. (3 Wall.) at 173. The district court did not clearly err in finding that Doyle's injuries could have been prevented if Graske had exercised reasonable care by waiting to accelerate until Doyle was seated at midship or the stern. After all, Graske and Van Hook were riding in those areas when the boat suddenly turned, and both were able to avoid harm. Doyle's injuries were therefore not the inevitable consequence of the malfunctioning of the boat's steering system. The district court's finding that Graske's negligence was a proximate and substantial cause of Doyle's injuries is not clearly erroneous.

## IV.

Finally, Graske challenges the district court's award of loss-of-consortium damages to Doyle's wife, Anne. "Loss of consortium" refers to "loss of the benefits that one spouse is entitled to receive from the other, including companionship,

cooperation, aid, affection, and sexual relations." *Black's Law Dictionary* 1031 (9th ed. 2009). In the context of marriage, the terms "loss of consortium" and "loss of society" are used interchangeably. *In re Midland Enters., Inc.*, 886 F.2d 812, 816 n.4 (6th Cir. 1989). Graske contends that general maritime law does not allow recovery for loss of consortium by the spouse of a nonseafarer negligently injured beyond the territorial waters of the United States. A "nonseafarer" is someone, like Doyle, who is neither a seaman covered by the Jones Act, 46 U.S.C. § 30104, nor a longshore or harbor worker covered by the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq. See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 n.2 (1996). We review *de novo* the question whether general maritime law allows recovery for loss of consortium. *See In re Am. Milling Co.*, 409 F.3d 1005, 1013 (8th Cir. 2005).[2]

The Supreme Court's most recent guidance on how to approach this sort of problem came in *Atlantic Sounding Co. v. Townsend*, 129 S. Ct. 2561 (2009). There, the Court considered "whether an injured seaman may recover punitive damages for his employer's willful failure to pay maintenance and cure." *Id.* at 2565. The Court began its analysis by reviewing the history of punitive damages under the common law generally and federal maritime law specifically. Based on that review, the Court determined that "punitive damages have long been available at common law," and that "the common-law tradition of punitive damages extends to maritime claims." *Id.* at 2569. The Court reasoned that because "there is no evidence that claims for maintenance and cure were excluded from this general admiralty rule," the only question remaining was whether the rule had been abrogated by Congress's enactment of the Jones Act, which provided seamen a statutory cause of action for negligence.

_____

[2]The Doyles contend that Graske waived his argument that loss-of-consortium damages are unavailable under general maritime law by raising it for the first time in a post-verdict motion. In ruling on that motion, however, the district court considered and rejected Graske's argument on the merits. The issue is a purely legal one, and we proceed to consider it.

*Id.* The Court concluded that the rule had survived the Jones Act, because the Act did not address either maintenance and cure or its remedy. *Id.* at 2572. Because Congress had not altered the traditional understanding regarding the availability of punitive damages in admiralty, the Court held that "such damages for the willful and wanton disregard of the maintenance and cure obligation should remain available in the appropriate case as a matter of general maritime law." *Id.* at 2575.

Applying the *Townsend* approach here, we conclude that there is no well-established admiralty rule, as there is with respect to punitive damages, authorizing loss-of-consortium damages as a general matter. In 1963, the question whether maritime law allowed recovery of loss-of-consortium damages by the wife of a longshoreman negligently injured in state territorial waters was "presented for the first time in a federal Court of Appeals." *Igneri v. Cie. de Transports Oceaniques*, 323 F.2d 257, 258 (2d Cir. 1963). In an opinion by Judge Friendly, the Second Circuit noted that common-law authorities regarding a wife's recovery for loss of consortium were "conflicting," *id.* at 265, and that there were no maritime cases pertaining to the issue except for two district court decisions denying such recovery. *Id.* at 265-66. Against this backdrop, the court rejected the wife's loss-of-consortium claim. *Id.* at 267.

Loss-of-consortium damages were not definitively recognized under general maritime law in any context until 1974, when the Supreme Court held in *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573 (1974), that a wife could recover such damages for the wrongful death of her husband, a longshoreman killed in state territorial waters. Six years later, in *American Export Lines, Inc. v. Alvez*, 446 U.S. 274 (1980), the Court extended *Gaudet* to personal injury actions, holding that "general maritime law authorizes the wife of a harbor worker injured *nonfatally* aboard a vessel in state territorial waters to maintain an action for damages for the loss of her husband's society." *Id.* at 276 (plurality opinion); *see id*. at 286 (Powell, J., concurring in judgment). The plurality in *Alvez* explained in its discussion of the Second Circuit

-10-

decision in *Igneri* that although "the principles of maritime law prevalent in 1963 militated against, rather than supported, the creation of a right to recover for loss of society," *id.* at 280, *Gaudet* had since provided "the conclusive decisional recognition of a right to recover for loss of society that *Igneri* found lacking."  *Id.* at 280-81.

The short history of loss-of-consortium damages in admiralty consists almost entirely of the Supreme Court's relatively recent decisions in *Gaudet* and *Alvez*. Given the narrow holdings of those decisions, general maritime law on loss-of-consortium damages remains an area marked by few settled principles.  Thus, unlike the Court in *Townsend*, which was not asked to "change maritime law in its operation as an admiralty court," we cannot simply apply a preexisting general rule left unaltered by Congress.  129 S. Ct. at 2574 n.11.

The Court in *Alvez* recognized a right to recover loss-of-consortium damages for nonfatal injuries to a spouse in the territorial waters of the United States, but Doyle was injured nonfatally beyond such waters, off the coast of Grand Cayman Island. Whether someone in the position of Doyle's wife may recover loss-of-consortium damages is an open question in this circuit.  Because we are confronted with an issue of first impression, we must continue the development of general maritime law "in the manner of a common law court."  *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2619 (2008); *see Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 360-61 (1959).

In exercising this authority, we heed the policy choices made by Congress. "Admiralty is not created in a vacuum; legislation has always served as an important source of both common law and admiralty principles."  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 24 (1990).  Where there is no recognized claim under general maritime law, as there was in *Townsend*, an admiralty court should look to legislative enactments governing closely related claims for policy guidance.  *Id.* at 27.  After reviewing the relevant policy pronouncements by Congress, we conclude that allowing recovery for loss of consortium here would give rise to two serious

disparities between general maritime law and legislative policies. These anomalies counsel against recognizing a right to recovery.

First, the spouses of those injured nonfatally beyond state territorial waters would be treated differently than the spouses of those injured fatally. Congress enacted the Death on the High Seas Act ("DOHSA"), 46 U.S.C. § 30301 *et seq.*, to provide a remedy in admiralty for wrongful deaths occurring more than three miles from the shore of the United States. *Id.* § 30302. Under DOHSA, a decedent's survivors may recover only for pecuniary loss; damages for loss of society are not available. *Id.* § 30303. The Supreme Court has held that DOHSA provides the exclusive measure of damages in wrongful-death actions arising beyond the three-mile limit. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 623 (1978). Accordingly, the spouses of those injured fatally beyond that limit have no claim to loss-of-consortium damages. To allow recovery of such damages by the spouses of those injured *nonfatally* in the same waters would thus give rise to a significant anomaly. Indeed, the Court confronted just such a disparity in *Alvez*, and extended the holding of *Gaudet* to avoid it. Five Justices agreed that "there is no apparent reason to differentiate between fatal and nonfatal injuries in authorizing the recovery of damages for loss of society." *Alvez*, 446 U.S. at 281 (plurality opinion); *see id.* at 286 (Powell, J., concurring in judgment) ("Since I see no rational basis for drawing a distinction between fatal and nonfatal injuries, I join in the judgment of the Court."). *Alvez* rejected a disparity between fatal and nonfatal injuries *within* territorial waters, and there is no reason to think that a disparity of that kind *beyond* such waters is more acceptable.

Second, if the spouses of injured nonseafarers like Doyle could recover loss-of-consortium damages on claims of negligence, then their rights under general maritime law would be greater than the rights of the spouses of injured seamen under the Jones Act. Although the Jones Act provides an action in negligence for injury to seamen, it does not authorize recovery by the seaman's spouse for loss of consortium. *See*

*Miles*, 498 U.S. at 32. It would be odd if the relief available to the spouse of a nonseafarer were more expansive than that which Congress has afforded the spouse of a seaman. After all, the principles of maritime law have always included "a special solicitude for the welfare of seamen and their families." *Id.* at 36; *see also Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 387 (1970) (noting the development under maritime law of "a special solicitude for the welfare of those men who undertook to venture upon hazardous and unpredictable sea voyages"). There is no reason to believe that Congress meant to place the spouses of injured seamen in a worse position than the spouses of injured nonseafarers. *Cf. Igneri*, 323 F.2d at 267 ("We can think of no reason why Congress, having ruled out a maritime claim against the ship for loss of consortium by the spouse of a negligently injured seaman, would wish the courts to construct one for the spouse of a negligently injured stevedore.").

Given the value of uniformity recognized in *Miles*, 498 U.S. at 33, we agree with the Fifth and Ninth Circuits that general maritime law does not allow recovery of loss-of-consortium damages by the spouses of nonseafarers negligently injured beyond the territorial waters of the United States. *See Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1408 (9th Cir. 1994); *Nichols v. Petroleum Helicopters, Inc.*, 17 F.3d 119, 122-23 (5th Cir. 1994). It may be argued in reply that this holding creates an anomaly of its own. Under the rule we establish here, Anne Doyle may not recover loss-of-consortium damages, because her husband was negligently injured in waters beyond our nation's territorial sea. But under the rule set forth in *Alvez* (assuming that rule is not limited to the wives of harbor workers), she would have been able to recover for loss of consortium if the accident had occurred within territorial waters. This kind of disparity, however, already exists in maritime law: Loss-of-consortium damages are available under *Gaudet* when a wrongful death occurs in territorial waters, but not under *Higginbotham* and DOHSA when the death occurs on the "high seas." *See Higginbotham*, 436 U.S. at 624 & n.20. We therefore conclude that our holding best coincides with the congressional policies reflected in DOHSA and the Jones Act, as well as the Supreme Court's development of general maritime law.

\*     \*     \*

For these reasons, the judgment of the district court is affirmed in part and reversed in part.

_____